[No. S004567. Crim. No. 23341. Oct. 31, 1991.]

THE PEOPLE, Plaintiff aand Respondent, v.
DOUGLAS SCOTT MICKEY, Defendant and Appellant.

616

620

622

626

## COUNSEL

John B. Oakley, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Ronald S. Matthias, Martin S. Kane, Morris Beatus and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190 et seq.).

On May 29, 1981, the District Attorney of Placer County filed an information against defendant Douglas Scott Mickey. Count I charged that on or about September 29, 1980, defendant murdered Eric Lee Hanson. (Pen. Code, § 187.) Count II charged that on or about the same date he also murdered Catherine Blount. (*Ibid.*) As to each count, five special circumstances were alleged: multiple murder (*id.*, § 190.2, subd. (a)(3)); intentional murder for financial gain (*id.*, § 190.2, subd. (a)(1)); heinous, atrocious, or cruel murder (*id.*, § 190.2, subd. (a)(14)); felony-murder-robbery (*id.*, § 190.2, subd. (a)(17)(i)); and felony-murder-burglary (*id.*, § 190.2, subd. (a)(17)(vii)).

Defendant pleaded not guilty to the murder charges and denied the special circumstance allegations. On his motion, the court subsequently changed

venue from Placer County to San Mateo County. Also on his motion, it set aside both of the heinous-atrocious-cruel special-circumstance allegations.

Trial was by jury. The panel returned verdicts finding defendant guilty as charged on both counts of murder, determined each offense to be in the first degree, and found all the remaining special-circumstance allegations true. It subsequently returned a verdict of death. The court entered judgment accordingly.

As we shall explain, we conclude that except as to one of the multiple-murder special-circumstance findings and both of the intentional-murder-for-financial-gain special-circumstance findings, the judgment must be affirmed.

## I. FACTS

### A. *Guilt Phase*

At the guilt phase, the People introduced substantial evidence, both testimonial and physical, to prove the murder charges and special circumstance allegations. The evidence featured certain extrajudicial statements by defendant to persons including family members, friends, and acquaintances, the police, and a fellow inmate in jail. It also included testimony by Edward Rogers, who was an accomplice and took the stand under a grant of immunity. The tale told is long and detailed. Its substance is as follows.

In September 1980 defendant was married to Lieutenant Allison W. Mickey, an Air Force nurse, and resided with her and her two children in housing at Yokota Air Force Base in Japan. The couple was experiencing difficulties in their financial situation and consequent distress in their personal relationship. By the time of trial, their marriage had been dissolved.

About September 17, 1980, defendant returned to California, flying into Travis Air Force Base in Solano County. During much of his time in the state, he stayed with Rogers, a longtime friend, in Concord; both were about 31 years of age.

Defendant disclosed several reasons for his visit—including, primarily, an intent to execute a plan to rob and murder a man in Placer County and then possibly to travel to Alaska to kill his wife's former husband for the proceeds of a life insurance policy of which she and/or her children were beneficiaries.

The man in Placer County was Eric Lee Hanson. He dealt in marijuana and hashish, and also cultivated the former. He had a business partner by the name of Randy Hoehne. Hanson lived with his lover, Catherine Blount, in a house in the rural community of Ophir; Hoehne lived there as well, but at the time relevant here slept in a tent some distance away in order to guard the marijuana crop; Hanson was about 29 years old, Blount 18, and Hoehne 24.

Defendant had been a friend of Hanson for several years, but bore secret grievances against him and desired revenge. Years earlier, defendant believed, Hanson had stolen certain items belonging to him and his family. In 1979 defendant raided Hanson's marijuana crop in retaliation. After his arrival in California, he retrieved the drug from the place at which he had hidden it, and began to consume it continually—apparently together with alcohol. He discussed his scheme against Hanson with Rogers and took steps to accomplish his objective.

On September 22, 1980, defendant traveled to Hanson's home in a car he had borrowed from Rogers in order to carry out his plan. He arrived about 11 p.m. He was armed with a rifle belonging to Rogers, which he had fitted with a homemade silencer. Blount was alone in the house; Hanson and Hoehne were out on the property. Blount invited defendant in. Hanson soon returned. Defendant did not do the deed—apparently because Hoehne learned of his presence and could therefore link him to whatever might happen. He visited with Hanson and Blount, stayed overnight, and left the next day. During his time at the property, defendant observed Hanson counting "a good size stack of money"; he attempted to sell him some of the marijuana he had stolen the year before, but was unsuccessful.

On September 28, 1980, defendant again traveled to Hanson's home in order to carry out his plan, this time accompanied by Rogers in a pickup truck belonging to the latter. The pair established a rendezvous point at a public telephone booth near a restaurant a few miles from the house; defendant took down the number of that telephone and gave Rogers the number of Hanson's. They drove to the property. Rogers left defendant off. The time was near midnight. Defendant was armed with, at least, a knife belonging to himself and a pistol belonging to Rogers. Hanson and Blount were alone in the house; Hoehne was in his tent. Hanson and Blount greeted defendant at the door and invited him in.

During the earliest hours of September 29, 1980, evidently after Hanson and Blount went to sleep, defendant killed the couple: he bludgeoned Hanson with a baseball bat and slit his throat from ear to ear down to the spinal cord; he stabbed Blount seven times in the chest in a close pattern,

piercing her heart with three of the blows. Immediately thereafter, he removed a substantial quantity of property from the house, loaded it into a black Volkswagen Karmann Ghia that belonged to Hanson, and departed; he left no fingerprints behind. He arrived at the rendezvous point. Rogers followed in the pickup truck. Some distance away, with Rogers's help he transferred the goods to the truck and then wiped the Volkswagen clean of fingerprints and abandoned it there. Defendant said he wanted to go back and burn the house; Rogers dissuaded him, declaring one should never return to the scene of the crime. The pair drove back to Concord. Once there, defendant sutured with needle and thread a gaping injury he had sustained to his left leg during the events at Hanson's home. The pair proceeded to stash the stolen goods.

On September 30, 1980, defendant fled this country from Travis Air Force Base, stopped over in Hawaii, and arrived at Yokota Air Force Base in Japan on October 3. On October 2 Rogers made a statement to officers at the Placer County Sheriff's Department implicating himself and defendant in the deeds described above. Defendant was subsequently arrested in Japan and was eventually returned to this state.

In his defense, defendant introduced little evidence, and did not himself take the stand. It was his basic position that the People failed to sustain their burden to prove him guilty beyond a reasonable doubt as to any applicable mental state required for criminal liability. More positively, he claimed that in committing the acts in question he acted in self-defense or under voluntary intoxication and/or diminished capacity as a result of voluntary intoxication.[1] For his defense, he relied on certain of his extrajudicial statements introduced by the People, which if believed could support his position.

## B. *Penalty Phase*

At the penalty phase, the People introduced evidence in aggravation that they themselves characterized as "very limited." Specifically, they attempted to prove that on four occasions, in the course of domestic disputes involving his first and second wives, defendant engaged in other violent criminal activity, viz., assault and/or battery.

By contrast, defendant introduced substantial evidence in mitigation.

---

[1]The defense of diminished capacity, which was abolished by statute as of January 1, 1982 (Stats. 1981, ch. 404, §§ 2, 4, pp. 1591-1592, amending Pen. Code, § 22, and adding Pen. Code, § 28), remains available for crimes—such as the present—committed before that date. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1240-1241 [278 Cal.Rptr. 640, 805 P.2d 899].)

Family members, friends, and acquaintances narrated a story of defendant's background and character. Its main points are these.

Defendant's parents, Robert and Dorothy Mickey, were married in 1946; defendant's brother Ronald was born in 1947, defendant himself in 1948; the family lived in the environs of Placer and Nevada Counties. Defendant was a good, loving, and hardworking child and youth.

Tragedy, however, touched defendant's life. When he was about five years of age, a half brother named Randall was killed in an automobile accident. When defendant was about 17, his mother died in an automobile crash— possibly by accident and possibly by suicide. He had been very close to her, and felt her loss deeply. He turned to alcohol to deaden the pain. Not long afterward, his maternal grandfather died. A little later, his brother Ronald killed himself.

Defendant began to drift through life, moving from job to job, place to place, marriage to marriage. He developed a taste for various illicit substances, including marijuana, hashish, mescaline, psilocybin, hallucinogenic mushrooms, phencyclidine (PCP), and lysergic acid diethylamide (LSD). He also developed an interest in eastern religions. He soon met Hanson, who shared his taste and interest. The two men quickly became close friends. They engaged in unusual behavior under the influence of the illicit substances they ingested. For example, they "would get naked and admire . . . the strength in their bodies . . . . And they would talk about philosophies and run through the hills like deer . . . ."

With the exception of the crimes of which he had been convicted and the other unadjudicated violent criminal activity, defendant was nonviolent, and would likely adapt well to life in prison.

Two experts gave opinions bearing on defendant's mental state at the time of the crimes. Each testified in substance that at the critical time, defendant did not have the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law—or at best, any capacity he may have had was "severely" or "significantly" impaired. Each identified two causes of defendant's condition: long-term and heavy "polysubstance" abuse and psychopathology. Each discovered a delusional system that was apparently based on writings of an author named Carlos Castaneda, who was then popular in the drug culture. In that system, as one of the experts stated in pertinent part, Hanson was the master and defendant the apprentice; defendant wished to become a "spiritual warrior"; at one point, Hanson began to "rob[ ]" defendant of the "power" he needed to achieve his goal; defendant had to kill Hanson to get his "power" back—and did so. Each

expert's opinion was based in large part on information provided by defendant himself.

In rebuttal, the People introduced evidence in the form of opinion by an expert to counter the opinions of defendant's experts. The opinion of the People's expert was based on information coming from sources including defendant as well as his family, friends, acquaintances, and others. The People's expert contradicted defendant's.

## II. GUILT ISSUES

Defendant raises a number of claims challenging the judgment as to guilt. As will appear, none is meritorious.

### A. *Denial of Motion to Suppress Statements*

Prior to trial, defendant moved to suppress evidence of certain statements he had made. On October 14, 1980, he was arrested in Japan for the murder of Hanson and Blount. On January 16, 1981, he departed Japan for the United States in the custody of Robert P. LaRoche, a deputy United States Marshal for the Eastern District of California; Donald J. Nunes, the Sheriff of Placer County; and Curtis A. Landry, a deputy sheriff and detective under Nunes's command. The party flew from Tokyo to Honolulu, stayed overnight, and then flew from Honolulu to San Francisco. During the Tokyo-Honolulu flight and later in Honolulu, defendant made self-inculpatory statements to Detective Landry. As relevant here, the suppression motion was based on the broad ground that the statements in question were involuntary and hence inadmissible: they were involuntary as a matter of fact under the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution; and they were involuntary as a matter of law under the rule of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (hereafter sometimes *Miranda*).[2]

---

[2]Before filing the present suppression motion, defendant had submitted a motion under Penal Code section 1538.5 to suppress certain evidence, including the statements in question, on the ground that such evidence had been obtained as a result of one or more unreasonable searches or seizures in violation of provisions of law including the Fourth and Fourteenth Amendments to the United States Constitution and article I, section 13, of the California Constitution. In the papers supporting the present suppression motion, defendant relied on this ground too. The trial court subsequently denied the Penal Code section 1538.5 motion in its entirety. Thereafter, defendant effectively abandoned the unreasonable-search-and-seizure claim in the present suppression motion—evidently because the issue had been resolved against his position. He does not attempt to raise it here. In the briefs submitted on his behalf by appointed appellate counsel, which fill about 800 pages and contain 16 appendices, defendant does not challenge the court's ruling on the Penal Code section 1538.5 motion. But

The trial court conducted a hearing. Defendant and the People introduced evidence, both testimonial and documentary. The witnesses included Marshal LaRoche, Sheriff Nunes, and Detective Landry, but not defendant. The court found facts expressly and impliedly. Those facts tell the following tale.[3]

During the earliest hours of September 29, 1980, defendant killed Hanson and Blount. On September 30 he fled this country from Travis Air Force Base, stopped over in Hawaii, and arrived at Yokota Air Force Base in Japan on October 3. At that time, he was still married to Lieutenant Allison W. Mickey, an Air Force nurse, and resided with her and her two children in base housing.

On October 7, 1980, the People filed a complaint in the Justice Court for the Auburn-Colfax Judicial District of the County of Placer accusing defendant of murdering Hanson and Blount under special circumstances. That same day, an arrest warrant was issued by the court, indicating Yokota Air Force Base as defendant's residence.

On October 11, 1980, Sheriff Nunes left for Japan, taking with him the arrest warrant and supporting papers. A provisional warrant for detention was subsequently issued by Japanese authorities.

On October 14, 1980, defendant was arrested by United States Air Force security police officers at his residence on the Yokota Air Force Base. Shortly thereafter, Sheriff Nunes met defendant. He advised him of his rights under *Miranda*. Defendant told Nunes that "he did not want to decide

---

in an eight-page supplemental brief submitted pro se, he purports to raise an attack. The claim lacks merit. Defendant says the search of the murder scene was unreasonable. It was not. Contrary to his assertion, the police had the consent of Hoehne and others. He also says his arrest was unlawful. It does not appear to have been. In any event, the evidence seized was taken with his consent. Finally, he says the search of his family's residence at Yokota Air Force Base in Japan was unreasonable. It was not. The authorities had the consent of his wife Allison.

Notwithstanding defendant's implication, the present suppression motion was *not* based on the ground that the statements in question were inadmissible as obtained in violation of his right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15, of the California Constitution, and related guaranties—and it was not substantially based on the ground that they were inadmissible as involuntary under any California counterpart to the *Miranda* rule.

[3]In setting out the facts pertinent to the present suppression motion, we look, of course, to the record of the hearing thereon. On appeal, both defendant and the People look beyond to the record of the hearing on the previously filed, and denied, Penal Code section 1538.5 motion. (See fn. 2, *ante*.) But it was not on *that* record that the present suppression motion was litigated and decided. Indeed, at the hearing on the present suppression motion the prosecutor expressly declared that "this is a separate proceeding than the 1538.5," and defense counsel did not disagree.

whether to talk to [him] or not at that time. That he wished to counsel with a friend"—who was apparently a "military attorney"—"before making a decision." Thereupon, conversation essentially ceased. Nunes, however, did inform defendant that he would be held at the Tokyo Detention House pending extradition. Defendant was surrendered to Japanese authorities. From that day forward, defendant's wife Allison cooperated with Nunes and other officials.

On October 15, 1980, it appears, defendant expressed a desire to waive extradition proceedings and return to the United States voluntarily. Sheriff Nunes learned of this fact from the United States Embassy. Through the embassy he attempted to arrange a meeting with defendant to seek confirmation, but was informed he had requested to speak only with his wife.

On October 16, 1980, at Sheriff Nunes's request, Allison visited defendant and asked whether he did in fact desire to waive extradition; defendant apparently answered in the affirmative. The Japanese government, however, would not permit a waiver.

On October 18, 1980, Sheriff Nunes departed Japan. He left behind certain evidence he had gathered relating to the murder of Hanson and Blount for use in the extradition proceedings. Those proceedings were subsequently conducted. Defendant was represented by counsel.

On January 12, 1981, Marshal LaRoche arrived in Japan with a warrant for defendant's extradition. With him were Sheriff Nunes and Detective Landry. The presence of nonfederal officers such as Nunes and Landry was not customary. It was permitted, however, when authorized. Such was the case here. Nunes and Landry went to Japan to collect evidence and interview witnesses and also to accompany defendant on his return. They did not intend to seek a statement from defendant, nor did they actually try to do so. In Nunes's words, "We were in transit. . . . [T]he conditions weren't conducive to that." During their stay in Japan, Nunes and Landry did in fact collect evidence and interview witnesses.

About 3:30 p.m. on January 16, 1981, Marshal LaRoche, Sheriff Nunes, and Detective Landry met defendant at the Tokyo Detention House in order to take him into their custody. Defendant was alert and in good health; he was also jovial and extremely talkative, evidently glad to be in the company of Americans and to be able to speak English. He recognized Nunes and appeared happy to see him again. Nunes engaged in "small talk" with defendant and helped him with his tie. Landry explained to defendant the

operation of a knee brace that would be used as a restraint. Landry knew defendant had previously been *Mirandized* by Nunes.

About 3:50 p.m. Marshal LaRoche, Sheriff Nunes, Detective Landry, and defendant boarded a van for Tokyo International Airport at Narita. The trip took approximately three hours. During the ride, defendant spoke with Nunes, who was seated next to him, and to a lesser extent with Landry. Although their conversation touched on such topics as the countryside and Tokyo's congested traffic, in LaRoche's view "Almost all of it concerned home town talk, [defendant's] father, friends, relations, people that they knew mutually." LaRoche "thought he talked an awful lot," and was "glad when he kept quiet." It was defendant who generally opened the conversation and directed its course. Throughout this period of time, there was no mention of the murder of Hanson and Blount.

About 7 p.m. Marshal LaRoche, Sheriff Nunes, Detective Landry, and defendant arrived at Tokyo International Airport. The group waited in a security area for more than an hour. Again there was "small talk," but no mention of the crimes. Landry was regularly afflicted with bad breath and constantly carried mints to deal with the problem. The day before, he had visited defendant's wife Allison at her residence. She kept a bowl of mints near the door, and gave him some. As a result of their close proximity, Landry noticed that defendant too had bad breath. He offered him a mint. Defendant took it and expressed recognition. Landry asked, "[D]o you know where I got this?" Defendant replied, "Yes," and "his chin quivered and he kind of bowed his head and put his head in his hands" and "covered his eyes . . . ." Some time later, the group boarded their plane.

About 9 p.m. Marshal LaRoche, Sheriff Nunes, Detective Landry, and defendant began their journey from Tokyo to Honolulu as their plane lifted off. The flight was scheduled to last about five hours. Defendant and Nunes took seats in one row, the former at the window, the latter on the aisle, with an empty seat in between; Landry and LaRoche took seats one row back. Defendant spoke to Nunes about his family and hobbies. He was talkative, pleasant, and cooperative, and did not exhibit any sign of grief or sadness. It was he who opened the conversation and directed its course. No mention was made of the crimes.

About an hour into the flight, Sheriff Nunes changed seats with Detective Landry in order to get some rest, and a half-hour later moved to an empty row, stretched out, and went to sleep. A snack was served. Defendant and Landry proceeded to consume a great deal of coffee during the remainder of the flight. Defendant started conversation with Landry by expressing a general preference for Asian food. Apparently, he then spoke of politics. He

went on to talk of his family and his love for his wife Allison and her children. He asked Landry about his family, and Landry responded. In the course of the discussion, Landry said that he remembered that defendant had played football in high school, and that he knew of his father and had participated in investigations surrounding the death of his mother and the suicide of his brother; he remarked that they "went back a long way together." Defendant also talked about such matters as "the economies of the two nations, Japan and the United States, the presidential elections in the past," "the present economy of West Germany, . . . and how much the mark is worth on the market." Landry generally "answered his questions and made the time go by as long as [he] was there." He considered him "well read." It was defendant who opened the conversation and directed its course. Again, no mention was made of the crimes.

About three hours into the flight, "there was a lull in the conversation" between Detective Landry and defendant. Defendant then asked "something to the effect if Eric and Catherine were buried together." Landry replied that Hanson and Blount had separate memorial services, their bodies were cremated, and their ashes were scattered in the High Sierra.

Thereupon defendant, in Detective Landry's words, "suffered an emotional lapse. He became a bit—crying, he was openly crying to me, the lower lip was quivering, he found it difficult to speak. When he was able to maintain some emotional control, he made reference—he made the statement twice that it should have never happened, it should have never happened and continued crying." "[H]e continually suffered this emotional upheaval and he cried openly. The inflection of his voice rose and he took a few moments and actual few moments and I couldn't tell you the time lapse to gain his composure. And again he made a statement to the effect that it would have been all right if Eric had listened to me and I didn't think he would react the way he did. And he continued in his state as I have described. . . . And he made mention . . . something to the effect the marijuana patch that had been ripped off the previous year and that the marijuana returned to Eric that night was the same marijuana that he had ripped off. And his emotional statement became again apparent and he was crying almost to the uncontrollable state. And again, the inflection of his voice was up when he mentioned something to the effect of everything went wrong, if only Eric hadn't lost his cool and he continued crying . . . ." During this episode, which lasted about 20 minutes, Landry was passive, saying and doing nothing.

About four hours into the flight, having composed himself, defendant resumed his conversation with Detective Landry. He spoke of his family and his love for his wife Allison and her children, as well as his hobbies and

politics. It was he who reopened the conversation and directed its course. No further mention was made of the crimes.

About 6:30 a.m. local time—or 1:30 a.m. Tokyo time—Marshal La-Roche, Sheriff Nunes, Detective Landry, and defendant ended their journey from Tokyo to Honolulu as their plane touched down. As the group prepared to disembark, defendant said, "Curt, I would like to continue our conversation at a later time." Landry replied, "Fine, yes." Defendant appeared in control of himself. The group passed through customs. LaRoche, Nunes, and Landry took defendant to the Honolulu jail by van; the ride took 30 to 45 minutes; there was not much conversation between defendant and the others; what talk there was generally concerned the scenery. Defendant was booked into the jail for the day; the procedure filled 30 to 45 minutes; LaRoche, Nunes, and Landry then left and proceeded to the United States Marshal's office in downtown Honolulu, at which they arrived about 45 minutes later.

Mid- to late morning, after they had parted company with defendant, Marshal LaRoche, Sheriff Nunes, and Detective Landry conversed together. Landry said that defendant had made statements concerning the crimes during the flight from Tokyo to Honolulu, and had requested to talk further about the subject. Nunes asked whether he had advised defendant of his *Miranda* rights. Landry said no. Nunes "very sternly" asked why had he not done so. Landry said, "I didn't feel I was interrogating Mr. Mickey at the time and I saw no reason to advise him of his rights." Nunes then consulted with the Placer County District Attorney's office by telephone on how to proceed with the matter. Afterward, he instructed Landry in substance as follows: return to the jail; ask defendant if he desired to speak further about the crimes; if he responded in the affirmative, advise him of his *Miranda* rights and obtain a waiver; and then commence interrogation. Landry was somewhat fatigued and wished to get some sleep before conducting the interview. Nunes directed him to set about the task forthwith. He complied.

At 12:42 p.m. local time—or 7:42 a.m. Tokyo time—Detective Landry met defendant in an interview room at the Honolulu jail. Defendant acknowledged that it was at his request that Landry was present. Landry advised defendant of his *Miranda* rights, and defendant proceeded to make a waiver. Interrogation ensued. Landry asked questions about the killing of Hanson and Blount, and defendant gave answers implicating himself in the deed and also in its planning and aftermath. Throughout the interview, defendant appeared alert and aware; at no time did he express any reluctance to respond or any desire to stop. On five or six occasions, he became "emotional" and paused to compose himself. Shortly before 5 o'clock, the

session closed. Defendant stated that he had spoken voluntarily and had not been coerced in any way.

The next day, it appears, Marshal LaRoche, Sheriff Nunes, Detective Landry, and defendant returned to the continental United States, flying from Honolulu to San Francisco.

In view of the foregoing facts, the trial court denied defendant's motion to suppress his statements to Detective Landry. It made determinations to the following effect, among others, either expressly or by implication: Sheriff Nunes properly advised defendant of his *Miranda* rights; defendant effectively invoked his right to counsel; all the same, his statements on the flight from Tokyo to Honolulu were voluntary because they were not coerced through "softening up" and did not result from interrogation, but were volunteered; the statements in Honolulu were also voluntary because they were not coerced, but were given after defendant himself initiated discussion and was subsequently readvised of, and waived, his rights. The statements in question were later introduced at trial.

█ Defendant now contends that the trial court erred by denying his motion to suppress what he refers to as his "inflight" and "Honolulu admissions."

The law that is applicable to the claim is well settled.

█ Under the due process clauses of both the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution, these principles are established: an involuntary confession or admission is inadmissible; a statement is involuntary if it is the product of coercion or, more generally, "overreaching"; involuntariness requires coercive activity on the part of the state or its agents; and such activity must be, as it were, the "proximate cause" of the statement in question, and not merely a cause in fact. (*People* v. *Benson* (1990) 52 Cal.3d 754, 778-779 [276 Cal.Rptr. 827, 802 P.2d 330].)

█ Next, in *Miranda* v. *Arizona, supra,* 384 U.S. 436, the United States Supreme Court laid down the following "prophylactic" rule (*Michigan* v. *Tucker* (1974) 417 U.S. 433, 446 [41 L.Ed.2d 182, 194, 94 S.Ct. 2357]) to implement the prohibition against compelled self-incrimination contained expressly in the Fifth Amendment and impliedly in the Fourteenth.

". . . [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure

the privilege against self-incrimination. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (384 U.S. at p. 444 [16 L.Ed.2d at pp. 706-707].)

■ The phrase "custodial interrogation" is crucial. The adjective encompasses any situation in which "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) The noun "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682], fn. omitted.)

■ Absent "custodial interrogation," *Miranda* simply does not come into play. (See, e.g., *Minnesota* v. *Murphy* (1984) 465 U.S. 420, 429-431 [79 L.Ed.2d 409, 420-422, 104 S.Ct. 1136] [no "custody"]; *Rhode Island* v. *Innis, supra,* 446 U.S. at pp. 298-302 [64 L.Ed.2d at pp. 306-309] [no "interrogation"].) *Miranda* does not "prohibit the police from merely listening to . . . voluntary, volunteered statements" uttered by a person, whether or not in custody, "and using them against him at the trial"—nor does the Fifth or Fourteenth Amendment. (*Edwards* v. *Arizona* (1981) 451 U.S. 477, 485 [68 L.Ed.2d 378, 101 S.Ct. 1880] (hereafter sometimes *Edwards*).) Hence if "custodial interrogation" is lacking, *Miranda* rights are not implicated and there is consequently "no occasion to determine whether there ha[s] been a valid waiver." (*Edwards* v. *Arizona, supra,* at p. 486 [68 L.Ed.2d at p. 387].)

■ In *Edwards* v. *Arizona, supra,* 451 U.S. 477, the United States Supreme Court laid down a "prophylactic rule" (*Oregon* v. *Bradshaw* (1983) 462 U.S. 1039, 1044 [77 L.Ed.2d 405, 411, 103 S.Ct. 2830] (plur. opn.)) to implement *Miranda*: "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (451 U.S. at pp. 484-485 [68 L.Ed.2d at p. 386].) An accused "initiates" such dialogue when he speaks words or engages in conduct that can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." (*Oregon* v. *Bradshaw, supra,* 462 U.S. at p. 1045 [77 L.Ed.2d at p.

412] (plur. opn.).) In the event he does in fact "initiate" dialogue, the police may commence interrogation if he validly waives his rights. (*Id.* at p. 1046 [77 L.Ed.2d at p. 413] (plur. opn.); *Edwards* v. *Arizona, supra,* 451 U.S. at p. 486, fn. 9 [68 L.Ed.2d at p. 387].)

■ On appeal, the conclusion of a trial court on a pure question of law is subject to independent review, whereas its finding on a pure question of fact is subject to review for substantial evidence—which, for present purposes, is equivalent to federal "clearly erroneous" scrutiny. (See generally *People* v. *Louis* (1986) 42 Cal.3d 969, 984-988 [232 Cal.Rptr. 110, 728 P.2d 180], following *United States* v. *McConney* (9th Cir. 1984) 1195, 1200-1204 [728 F.2d 1195] (in bank).)

Determinations as to the voluntariness of a statement for both the federal and state constitutional guaranties of due process of law—which is a resolution of a mixed question of law and fact that is nevertheless predominantly legal—are reviewed independently. (*People* v. *Benson, supra,* 52 Cal.3d at p. 779.) So too determinations as to the presence of coercive state activity and the existence of causality—also predominantly legal mixed questions. (*Ibid.*)

By contrast, findings on whether there was custodial interrogation—which appears to be a predominantly factual mixed question—are reviewed for substantial evidence or "clear error." (Cf. *United States* v. *Poole* (9th Cir. 1986) 806 F.2d 853, 853 [holding that "[t]he determination whether a defendant was subjected to custodial interrogation is essentially factual, and is reviewable under the [federal] 'clearly erroneous' standard"]; accord, *United States* v. *Gonzalez-Sandoval* (9th Cir. 1990) 894 F.2d 1043, 1046.) Likewise, findings on whether the accused effectively initiated further dialogue relating to the investigation—which, in our view, is also a predominantly factual mixed question.

Finally, determinations as to the validity of a waiver of *Miranda* rights—a predominantly legal mixed question—are reviewed independently. (E.g., *People* v. *Marshall* (1990) 50 Cal.3d 907, 925 [269 Cal.Rptr. 269, 790 P.2d 676].)

■ Having carefully scrutinized the record, we are of the opinion that the trial court did not err by denying defendant's motion to suppress the "inflight" and "Honolulu admissions."

First, after independent review we believe that defendant's "inflight admissions" were voluntary under the due process clauses of both the federal and state Constitutions.

The requisite coercive activity by the state or its agents is absent. With regard to the totality of the conversations disclosed by the record, it was generally defendant who was active and Marshal LaRoche, Sheriff Nunes, and Detective Landry who were passive: he opened discussion and directed its course; they essentially responded. So far as the challenged statements are concerned, Landry hardly acted at all—and manifestly did not "overreach" in any way.

Also absent is the necessary causal connection between any activity by the state or its agents and the statements in question. The record reveals that there was only one proximate cause—and indeed, only one cause of any real substance: defendant's desire to justify, excuse, or at least explain his problematic conduct.

Defendant argues that the required state coercion and proximate causation were indeed present in the "psychological and physiological pressure" he claims he experienced as a result of such factors as his extended incarceration in a foreign detention facility, his longing for his family, and the demands of travel.

■

There was no state coercion. This conclusion follows as a matter of law to the extent that the claimed "pressure" sprang from within defendant. The compulsion must be attributable to the state. The conclusion follows as a matter of fact to the extent that the "pressure" came from without. Its direct and substantial source was defendant's decision to flee from California to Japan in an attempt to avoid apprehension for the murder of Hanson and Blount—a decision for which the state cannot be held responsible.

Further, there was no proximate causation flowing from state activity. As noted, the sole cause of any substance for the statements in question was defendant's desire to justify, excuse, or at least explain.

Defendant asserts in substance that the People's labeling the statements "unreliable" at trial is an effective concession of their involuntariness. Not so. It is merely a declaration of the People's view that they are self-serving in some particulars.

In the course of his argument, defendant urges strenuously that Sheriff Nunes and especially Detective Landry intended to "soften" him up—i.e., to "coerce" a statement out of him by cajolery—and that they succeeded in doing so. The trial court made a determination to the contrary—soundly, in our judgment. The finding on the absence of the claimed intent is factual, and is supported by substantial evidence. The conclusion on the lack of

coercion and proximate causation is mixed and predominantly legal, and withstands de novo scrutiny.

Second, after independent review we believe that defendant's "inflight admissions" were voluntary under *Miranda.*

We shall assume for argument's sake that defendant did indeed invoke his right to counsel as declared by *Miranda* when he told Sheriff Nunes that he wished to consult with a friend, who was apparently a "military attorney," before deciding "whether to talk to [him] or not at that time."

Nevertheless, we cannot discern any "custodial interrogation" within the meaning of *Miranda.* The trial court found no such interrogation, and its finding is supported by substantial evidence. To be sure, defendant was in custody. But he was simply not interrogated. Plainly, there was no express questioning by any of the officers, including Detective Landry. Nor, in our view, were there any words or actions on their part that they should have known were reasonably likely to elicit an incriminating response. Defendant argues to the contrary—subtly, but unpersuasively.[4] As we have observed, the sole cause of any real substance underlying the statements in question was defendant's desire to justify, excuse, or at least explain. *Miranda,* as noted, does not "prohibit the police from merely listening to . . . voluntary, volunteered statements" uttered by a person, whether or not in custody, "and using them against him at the trial." (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 485 [68 L.Ed.2d at p. 387].) Here, Landry merely listened to the statements, which were voluntary and volunteered. Defendant argues that he did not waive his *Miranda* rights beforehand. But when, as here, "custodial interrogation" is lacking, *Miranda* simply does not come into play.

Third, after independent review we believe that defendant's "Honolulu admissions" were voluntary under the due process clauses of both the federal and state Constitutions. For the reasons stated above, we find absent both the requisite coercive activity by the state or its agents and the necessary causal connection between any such activity and the statements in question. Defendant argues that the "psychological and physiological pressure" he claims he experienced increased over time and distance as a result of fatigue and other factors. But any such increase was insufficient on this record to render the statements involuntary. Defendant also argues that the "Honolulu admissions" were involuntary as the product of the assertedly involuntary "inflight statements"—they were, so to speak, the tainted fruit of a poisonous tree.

---

[4]Hardly worthy of mention is defendant's apparent assertion that Sheriff Nunes's question about extradition, transmitted to him by his wife Allison, somehow amounted to "custodial interrogation" within the meaning of *Miranda* or otherwise violated the rule declared in that decision.

Because the tree was not poisonous, its fruit was not tainted. Defendant again argues in substance that the People's labeling the statements "unreliable" at trial is an effective concession of their involuntariness. We again reject the assertion.

Fourth, after independent review we believe that defendant's "Honolulu admissions" were voluntary under *Miranda.*

We recognize the prophylactic rule of *Edwards* v. *Arizona, supra,* 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386]: "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." There was no violation here. Defendant initiated further discussion when he said to Detective Landry, "Curt, I would like to continue our conversation at a later time." Certainly, his words can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." (*Oregon* v. *Bradshaw, supra,* 462 U.S. at p. 1045 [77 L.Ed.2d at p. 412] (plur. opn.).) The trial court impliedly found to that effect, and its finding is supported by substantial evidence.

At the threshold, defendant argues—again—about the tainted fruit of a poisonous tree. But again, no poison, no taint. ■ He then argues that the *Edwards* rule was in fact violated. He says that the rule requires the suspect to initiate the *meeting* with the police and not merely the *discussion,* "unless such a meeting . . . was in the 'normal course of events.'" We find no such requirement in *Edwards* itself or elsewhere. (See *Arizona* v. *Roberson* (1988) 486 U.S. 675, 687 [100 L.Ed.2d 704, 717, 108 S.Ct. 2093] [holding that "*any* 'further communication, exchanges, or conversations with the police' that the suspect himself initiates, *Edwards* v. *Arizona,* 451 U.S., at 485, are perfectly valid" (first italics added)].) He next says that he did not in actuality initiate further discussion. His assertion founders on the words he spoke. Indeed, at one point in his briefing he concedes that "[t]he 'conversation' to be continued was the very 'conversation' surrounding and including the inflight admission[s]."

■ When, as stated above, there is no violation of the *Edwards* rule, the police may commence interrogation if the suspect validly waives his *Miranda* rights. Such a waiver is evident here. The trial court so determined. And on independent review we agree. Defendant argues that the "psychological and physiological pressure" he claims he experienced, as well as other factors, prevented him from making a voluntary, knowing, and

intelligent waiver. ██ ▀▀█ The record does not support his position.[5]

## B. *Denial of Motion to Suppress Letters*

Prior to trial, defendant moved to exclude more than 24 letters he had written and sent to his wife Allison. As relevant here, he claimed a privilege under Evidence Code section 980 to refuse and prevent the disclosure of the letters as confidential marital communications. Evidence Code section 980 declares in pertinent part that "a spouse . . . has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if . . . the communication was made in confidence between him and the other spouse while they were husband and wife." The People opposed the motion. They denied the claim of privilege. At issue (among other questions) were whether defendant intended nondisclosure of the letters' contents, and whether he had a reasonable expectation of privacy therein.

The trial court conducted a hearing. Defendant called Detective Landry as a witness. The People introduced three of the letters into evidence. The following facts were established beyond dispute: defendant wrote the letters in question to his wife Allison while he was incarcerated in the Tokyo Detention House, and sent them to her from that location; in the letters introduced at the hearing, he revealed a belief that Japanese and/or United

[5]Defendant presents certain other arguments in support of his claim that the trial court erroneously denied his motion to suppress his "inflight" and "Honolulu admissions" as violative of due process and *Miranda.* Most are reducible to arguments addressed and rejected above; some were not raised below and go beyond the legal issues and factual matters litigated there (including an assertion that the exercise of his right to counsel under *Miranda* was somehow frustrated by federal and/or state agents); and none is meritorious.

We reject on procedural grounds defendant's claim that the trial court erroneously denied his motion to suppress the statements in question as violative of his federal and state constitutional rights to counsel and related guaranties. As noted, defendant did not move to suppress the statements on such a basis. (See fn. 2, *ante.*) Accordingly, he may not attack the ruling on that ground. When an argument was not presented to support a motion, it may not be urged to attack the subsequent ruling. (See *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1264-1265 [270 Cal.Rptr. 451, 792 P.2d 251].) We observe in passing that the right to counsel under *Miranda* is not itself a "right[ ] protected by the [United States] Constitution but [is] instead [a] measure[ ] to insure that the [Fifth Amendment] right against compulsory self-incrimination [is] protected." (*Michigan* v. *Tucker, supra,* 417 U.S. at p. 444 [41 L.Ed.2d at p. 193].) In other words, *Miranda*'s right to counsel was declared "in order to protect the Fifth Amendment privilege against self-incrimination rather than to vindicate the Sixth Amendment right to counsel." (*United States* v. *Gouveia* (1984) 467 U.S. 180, 188, fn. 5 [81 L.Ed.2d 146, 154, 104 S.Ct. 2292].)

We reject on the merits defendant's claim that the trial court erroneously denied his motion to suppress the statements in question as violative of any California counterpart to the *Miranda* rule. Having found no deviation from the federal standard, we cannot find—and surely defendant does not show—a deviation from any state analogue.

States authorities were intercepting all his mail and reading its contents; indeed, in those letters he directed comments to such "readers"; Allison received the letters and voluntarily turned them over to Detective Landry in Japan on January 15, 1981.

The trial court rejected the claim of privilege and denied the motion. At trial, the People introduced portions of three letters that had not been presented at the hearing for two purposes: (1) to show that around the time of the murder of Hanson and Blount, defendant and Allison were experiencing difficulties in their financial situation, and that defendant came to California from Japan to alleviate that condition; and (2) to corroborate the testimony of Edward Rogers on that point. "I am really glad Frank [Plunk, Allison's former husband,] came through, just think he might have loaned us the money all of the time." "My trip to Cal wasn't in vain. I finally found out you truly loved me and you got your bills paid. That is a pretty good haul for both of us." "I would sacrifice everything for you. Hell, look I have. Actions speak louder than words. You got the money you wanted and now you ignore my need."

 Defendant now contends that the trial court erred by denying his motion.

 It appears that a ruling on a motion such as the present, which concerns the admissibility of evidence, is subject to review for abuse of discretion. (Cf. *United States* v. *Marashi* (9th Cir. 1990) 913 F.2d 724, 729 [holding to that effect under federal standard-of-review principles].) The underlying determinations, of course, are scrutinized in accordance with their character as purely legal, purely factual, or mixed.

 We are of the opinion that the ruling of the trial court is sound under any standard. The letters did not come within the privilege for confidential marital communications. The record establishes that the documents were not written or sent "in confidence." To make a communication "in confidence," one must intend nondisclosure (see *People* v. *Gomez* (1982) 134 Cal.App.3d 874, 879 [185 Cal.Rptr. 155]; *People* v. *Carter* (1973) 34 Cal.App.3d 748, 752 [110 Cal.Rptr. 324]), and have a reasonable expectation of privacy (see *North* v. *Superior Court* (1972) 8 Cal.3d 301, 311 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]). Apparently, defendant did not have the required intent. Certainly, he did not have the necessary expectation. The court made a determination to that effect. For purposes of the privilege, the existence *vel non* of a reasonable expectation of privacy appears to be a predominantly factual mixed question. (See *People* v. *Rodriguez* (1981) 117 Cal.App.3d 706, 715 [173 Cal.Rptr. 82] [to similar effect].) As such, its resolution is subject to review for substantial evidence.

But even if scrutinized de novo, the court's determination is plainly correct. Defendant had no expectation of privacy, reasonable or otherwise. As noted, he believed that the Japanese and/or United States authorities were intercepting all his mail and reading its contents.

Defendant argues against our conclusion, but to no avail. In substance, his attack is against the trial court's reasoning. But of course, we review the ruling, not the reasoning. And as we have explained, the ruling was sound. In any event, the reasoning was substantially similar to that set out above. Defendant asserts that the court misallocated the applicable burdens of proof. We are not persuaded. ■■■ As a general matter, the claimant of the confidential marital communication privilege has the burden to prove, by a preponderance of the evidence, the facts necessary to sustain the claim. (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 25.2(p), p. 715 [speaking generally of claimants of privileges].) He is aided by a presumption that a marital communication was made in confidence. (Evid. Code, § 917.) The opponent has the burden to prove otherwise (*ibid.*) by a preponderance of the evidence (see *id.*, § 115). Although the court could have dealt with the burdens more explicitly, any deficiency under these circumstances was certainly not fatal.

## C. *Denial of Motion to Exclude Photographs*

Prior to trial, defendant moved for a hearing to determine the admissibility of certain photographs that the People intended to introduce into evidence. The photographs included what were referred to as items 33A, 33B, 33C, 33D, 33E, and 33F—which depicted Hanson's body at the crime scene—and items 36A, 36B, 36C, 36D, 36E, and 36F—which depicted Blount's body at the same place. At the hearing, defendant argued that items 33A, 33B, 33C, 33D, 36D, and 36E should each be excluded under Evidence Code section 352 as substantially more prejudicial than probative, specifically, as overly gruesome or merely cumulative or both. The People agreed as to item 33C—expressly conceding that it was cumulative to other photographs—but disagreed as to the others. The trial court reviewed each of the photographs defendant sought to exclude. Thereupon, it granted the motion with regard to item 33C, but denied it with regard to items 33A, 33B, 33D, 36D, and 36E. At trial, the People sought to introduce the five nonexcluded photographs, among others. Defendant renewed his motion. The court denied the request again. It then received items 33A, 33B, 33D, 36D, and 36E into evidence as exhibits 33-A, 33-B, 33-D, 36-D, and 36-E.

■■■ Defendant now contends that the trial court's ruling was erroneous as to item 33D/exhibit 33-D. The decision comprises a determination as to undue prejudice. The appropriate standard of review is abuse of discretion.

(*People* v. *Benson, supra,* 52 Cal.3d at p. 786 [speaking specifically of photographs].) No abuse appears. We have ourselves reviewed the photograph in question, which shows Hanson's upper body and the wound to his throat. The court could have reasonably concluded that the evidence was not substantially more prejudicial than probative. It was relevant to the crucial issues bearing on defendant's conduct and mental state at the time of the crimes. Moreover, it was not overly gruesome—at one point during the hearing below defense counsel conceded as much—nor was it merely cumulative to other evidence.

Defendant claims that the trial court did indeed err. His first attack is "procedural." It fails. Of course, "on a motion invoking [Evidence Code section 352] the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value . . . ." (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468], citing authorities; accord, *People* v. *Wright* (1985) 39 Cal.3d 576, 582 [217 Cal.Rptr. 212, 703 P.2d 1106].) The record here does so. Contrary to defendant's implication, no more is required. Certainly, the trial judge need not expressly weigh prejudice against probative value—or even expressly state that he has done so (see *People* v. *Johnson* (1987) 193 Cal.App.3d 1570, 1576 [239 Cal.Rptr. 190]). Defendant's second attack is "substantive." For the reasons stated above, it fails as well.

### D. *Denial of Motions for Continuance*

Defendant contends that the trial court erred by denying, inter alia, certain motions he made for continuance of proceedings. The record pertinent to this claim must be set out at some length.

On January 20, 1981, Fred P. Tuttle III was appointed to represent defendant as counsel. On February 11, 1981, Lyle H. Shattuck was appointed as associate counsel. Trial was later set for November 9, 1981. On motion by both the People and defendant, it was continued to March 22, 1982. On defendant's motion, it was continued again to November 8, 1982. Trial was subsequently reset for March 28, 1983. On defendant's motion, it was continued yet again to May 9, 1983, this time to allow the National Jury Project, which had been retained by counsel at a cost of $15,000, to provide defendant with assistance in the process of jury selection. Trial was later reset to May 11, 1983, with hearings on a number of pretrial motions scheduled for May 9, 1983.

On May 9, 1983, defendant moved for a continuance of all proceedings. His grounds were these: (1) Attorney Shattuck had unexpectedly fallen ill and was absent; and (2) the defense needed more time to locate, contact, and

interview possible penalty phase witnesses in order to furnish the National Jury Project with certain information it required. The trial court held a hearing that day. Requesting an immediate continuance of 60 days, Attorney Tuttle argued both the "illness" and "lack of preparation" claims. He urged the former mainly in open court. He pressed the latter almost exclusively in chambers, outside the prosecutor's presence. There, he stated in substance as follows: the defense believed that the penalty phase "is the most important phase as far as this case is concerned. The guilt phase, there is very little to be done in that regard so far as the Defendant is concerned"; counsel had three possible penalty phase witnesses; those persons had become hostile; as a result, counsel did not have sufficient information to furnish to the National Jury Project; if they failed to furnish such information, they "would deprive the Defendant of his rights"; in fact, as a result of the foregoing, they were not prepared for the penalty phase.

The trial court decided not to rule on the motion at that time. It was inclined to reject the claim of lack of preparation. But it wished to obtain more information about the claim of illness. To accommodate certain personal concerns expressed by Attorney Tuttle, it continued the previously scheduled matters to the next day.

On May 10, 1983, the trial court reopened the hearing on defendant's motion for continuance. Both Attorney Tuttle and Attorney Shattuck were present. Although Shattuck stated that he was not feeling well, he did not indicate that he was or would be unavailable because of illness.

At the hearing, argument focused on such matters as when the defense learned, or should have learned, of the identity of possible penalty phase witnesses; whether the information such persons might supply was required by the National Jury Project; and to what extent, if at all, counsel needed that group's assistance.

In the course of argument, Attorney Tuttle stated that defendant might have a "constitutional right" to the National Jury Project's assistance. To the trial court's question, "If the continuance was not granted, would that be a violation of this man's due process rights?," Tuttle responded, "Perhaps." He went on to explain: "Well, I just feel that it may be depriving him of a right to adequate representation by Counsel. Since they are in effect our agents and they are saying that they are unable to provide this service for which they have been retained, then perhaps he is not being provided with adequate Counsel."

The prosecutor remarked, "I just, Your Honor—the claim of ineffective assistance of Counsel, I just—I think there is just too many ifs . . . ."

Attorney Shattuck responded: "This is the first capital case that I have had. . . . I have been practicing approximately 30 years and I have handled quite a few jury trials. And since my contact with the National Jury Service [*sic*] I have realized that I didn't know anywheres near as much about picking jurors as I thought I did." He proceeded: "I, having learned as much as I have so far, I would feel incompetent to select a jury in a capital case without their assistance." He added, "[W]e really feel that we really need the National Jury Service [*sic*]." He conceded, however, that the group would provide assistance even if a continuance was not granted. He closed: "And we don't know what the evidence—they don't know what the evidence is and they can't assist us well and I personally feel if I couldn't have their assistance, my client would be denied the effective assistance of Counsel even though [I have] 30 years of experience and I tried a lot of cases."

The trial court denied the motion, finding that "there is no good cause for continuance."

Jury selection commenced on May 11, 1983. The National Jury Project assisted defendant throughout the process. On May 19 defense counsel stated that defendant would move for a continuance based on the absence of the defense investigator—who had evidently been injured in an automobile accident—as soon as they received the relevant medical reports. On June 9 jury selection was completed.

That same day, defendant orally moved for a continuance of trial. His ground was lack of preparation attributable in part to the injury suffered by the defense investigator.

The trial court put the matter over to June 14, 1983, to allow defendant an opportunity to file supporting papers, and stated that it would make its ruling on that date.

At that point, defendant began to speak: "Your Honor, I have something I would like to say, I feel needs to be on the record." Attorney Tuttle explained, "It's in regard to our possible competence or incompetence, Your Honor . . . ." With counsel's consent, the trial court allowed defendant to proceed. He stated: "It concerns the preparation of my defense, Your Honor. I have been—I have given my lawyers a long—a list a long time ago of witnesses, and to my knowledge, 75 percent of them have not been inter-viewed. I don't even know if I have a defense at the guilt or the penalty phase." The court asked, "At this time, you are saying that your attorneys are incompetent?" Defendant answered nonresponsively, "I have had them for quite a while." He then went on: "I would like to go—if we could have a

continuance and I could find out myself. I just talked to the investigator on the phone myself." The court reiterated that it had put the matter over and would not make a ruling immediately.

On June 14, 1983, defendant filed papers supporting his June 9 motion for continuance, asking that trial be scheduled for July 5, 1983. He restated his ground as lack of preparation attributable in part to the injury suffered by the defense investigator and a consequent threat to the effectiveness of counsel's assistance at the guilt phase.

At the hearing that day, the trial court stated to defense counsel: "I will be awfully frank with you gentlemen, I don't think there is any just cause for a continuance." Its reason, in a word, was "the age of the case." Counsel proceeded to present argument.

With counsel's consent, the trial court then allowed defendant to make a statement. He said in substance that at the time the defense investigator suffered his injury, he began to seriously question counsel's competence; he admitted he had made no attempt to address his concerns to the court at that time; he now believed that counsel were unprepared for trial and hence incompetent for the task; he also believed that counsel had not adequately cooperated with his efforts to aid the defense; he added: "I am totally inexperienced in legal matters and I am at a loss as to what is proper steps to be taken. I am not even sure that a continuation can or will rectify the deficiencies of my defense team preparation."

Thereupon, Attorney Shattuck moved to withdraw from representing defendant "if [that is] the way my client feels about my competence."

The trial court denied defendant's motion for continuance. It stated in relevant part: "This case has been going for two and a half years. Eventually this whole idea is to search for the truth. Now we have gotten to the place where we get involved in the search for the truth. Now it has to happen." The court also denied Attorney Shattuck's motion to withdraw.

Attorney Tuttle renewed the motion for continuance, observing that neither the People nor defendant was ready to proceed: "I can't see that there is any great crisis as far as a one week or two week continuance . . . ."

The trial court effectively set aside its denial of the motion and then ordered a one-week continuance to June 21, 1983, in order to "accom[m]odate both sides." It noted that Attorney Shattuck had unsuccessfully moved to withdraw. It also noted that defendant "has been straddling the fence whether he wants another attorney. I get the impression that he does . . . ."

It then stated that "we have got [June 21] for you to do whatever you have to do, along those lines[.]" It reminded counsel as the hearing was about to close: "And if you could advise your client about that incompetency if he wants to do what he wants he has got time to do whatever he wants to do." Attorney Shattuck responded: "Yes, Your Honor. I will confer with him right away."

On June 21, 1983, the guilt phase opened. Defendant did not renew his motion for continuance. Nor did he attempt to express any complaints about counsel. Neither did Attorney Shattuck renew his motion to withdraw. On July 12 defendant moved for a continuance of 30 days between the end of the guilt phase and the beginning of the penalty phase, if any. On July 20 the guilt phase closed with the jury's adverse verdicts and special-circumstance findings. Later that day, the trial court ordered a continuance of about three weeks, to August 9. On that date, the penalty phase opened. On August 26 it closed with the jury's verdict of death.

 Defendant now claims that the trial court erred by denying the motions for continuance that he made on May 9, 1983, and June 9, 1983.

 The granting or denial of a motion for continuance rests within the sound discretion of the trial court. (E.g., *People* v. *Grant* (1988) 45 Cal.3d 829, 844 [248 Cal.Rptr. 444, 755 P.2d 894].) That discretion, of course, must be exercised in conformity with the applicable law. A continuance may be granted only on the moving party's showing of good cause. (Pen. Code, § 1050, subd. (e); Pen. Code, former § 1050, subd. (b), as amended by Stats. 1982, ch. 952, § 1, p. 3444.) Such a showing requires, inter alia, a demonstration that both the party and counsel have used due diligence in their preparations. (*People* v. *Grant, supra,* at p. 844.)

It follows that on appeal, a ruling on a motion for continuance is subject to review under the abuse-of-discretion standard. (See, e.g., *People* v. *Grant, supra,* 45 Cal.3d at pp. 843-844.)

 In our view, the trial court did not abuse its discretion by ruling as it did on defendant's motion of May 9, 1983. The court found that "there is no good cause for continuance." Its finding was not unreasonable. As noted, the motion rested on grounds involving Attorney Shattuck's illness and the defense's lack of preparation. The former was effectively withdrawn by Shattuck's presence at the May 10, 1983, hearing. The latter could certainly have been deemed insufficient. There was no demonstration that both defendant and his counsel had used due diligence. Indeed, the facts strongly suggested the opposite: Attorney Tuttle and Attorney Shattuck had been appointed in early 1981, trial was originally set to commence later that year,

and defendant himself evidently possessed much of the information considered crucial, viz., the identity of possible penalty phase witnesses.

Neither did the trial court abuse its discretion by ruling as it did on defendant's motion of June 9, 1983. It must be emphasized at the outset that contrary to defendant's characterization, the court *granted* the motion—although it continued trial only to June 21 and not to July 5 as had been requested. The court all but expressly found that defendant had failed to make a showing of good cause for a continuance beyond June 21. Its finding was not unreasonable. As noted, the motion rested on grounds of lack of preparation and a consequent threat to the effectiveness of counsel's assistance at the guilt phase. The former could have been deemed insufficient. There was no demonstration that both defendant and his counsel had used due diligence. Indeed, as stated above, the facts strongly suggested the opposite. The other ground could also have been deemed insufficient. Any threat to counsel's effectiveness at the guilt phase was speculative and nothing more—especially in view of Attorney Tuttle's statement in chambers on May 9, 1983, that "The guilt phase, there is very little to be done in that regard so far as the Defendant is concerned."

Defendant argues against our conclusion. But notwithstanding his assertion, he simply does not establish that the trial court erred in ruling as it did on either of his motions.

Defendant also claims that the trial court erred by denying what he asserts was his motion for substitution of counsel and by refusing to afford him a proper hearing on his underlying complaints about counsel's performance. The point is empty. There was no denial of a motion for substitution. Defendant never made any such request. Further, there was no refusal to afford him a proper hearing on his complaints. Indeed, the record is otherwise.

Defendant next claims that the trial court erred by denying Attorney Shattuck's motion to withdraw as counsel. Determination of such a request is entrusted to the sound discretion of the trial court. (See, e.g., *People* v. *McCracken* (1952) 39 Cal.2d 336, 350 [246 P.2d 913].) Accordingly, its decision is subject to review for abuse of discretion. (See *ibid.*) No abuse appears. As noted, Shattuck made his motion on June 14, 1983, following the completion of jury selection and prior to the opening of the guilt phase. He did so immediately after defendant expressed a belief that counsel were unprepared for trial and hence incompetent for the task—stating that he was seeking to withdraw "if [that is] the way my client feels about my competence." On this record, the trial court's ruling was certainly not unreasonable.

Put simply, the court could have viewed Shattuck's words as too little, too late.

 Finally, defendant claims in substance that the trial court's acts and omissions and/or the acts and omissions of counsel threatened to violate and/or did in fact violate his right under the Sixth Amendment to the effective assistance of counsel and/or representation free from conflicts of interest. Having reviewed the record in its entirety, we simply disagree. The acts and omissions in question did not implicate the Sixth Amendment in any significant way.

### E. *Denial of Separate Guilt and Penalty Juries*

Prior to trial, defendant made a motion to impanel separate juries to try the issues of guilt and penalty. He based his request on a claim that the exclusion through "California death qualification" of "guilt phase includables" violates a criminal defendant's right to a jury drawn from a fair cross-section of the community under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16, of the California Constitution.[6] He expressly declined to rely on a claim that the challenged exclusion violates a criminal defendant's right under the same provisions of the federal and state charters to a jury that is impartial—specifically, a panel that is neutral on the question of guilt and hence not conviction prone. The trial court denied the motion.

 Defendant contends that the trial court's ruling was erroneous. That is not the case.

The claim on which defendant relied below is without merit. The exclusion through "California death qualification" of "guilt phase includables" does not offend a criminal defendant's right to a jury drawn from a fair cross-section of the community under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16, of the California Constitution. (E.g., *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] (plur. opn.); *id.* at pp. 374-375 (conc. opn. of Kaus, J.); *People* v. *Guzman* (1988) 45 Cal.3d 915, 948-949 [248 Cal.Rptr. 467, 755 P.2d 917]; see, e.g., *People* v. *Warren* (1988) 45 Cal.3d 471, 479 [247 Cal.Rptr. 172, 754 P.2d 218] [adhering to *Fields*].)

---

[6]"California death qualification" limits "[t]he pool of jurors eligible to serve in a capital trial in California" to "those persons eligible to serve in a noncapital case whose attitudes toward capital punishment would place them in either the 'favor death penalty,' 'indifferent,' or 'oppose death penalty' group." (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 63 [168 Cal.Rptr. 128, 616 P.2d 1301].) "[G]uilt phase includables" (*id.* at p. 17, fn. 36) are those persons who would "automatically vote against death at the penalty phase" but could be "fair and impartial" at the guilt phase (*id.* at p. 17, italics deleted).

Further, the claim on which defendant expressly declined to rely is not preserved for review. As noted, there was no argument that the challenged exclusion offends a criminal defendant's federal and state constitutional rights to an impartial jury. Of course, when an argument was not presented to support a motion, it may not be urged to attack the subsequent ruling. In any event, we have never found the present argument persuasive. (See generally *Hovey* v. *Superior Court, supra*, 28 Cal.3d at pp. 8-69.) Our views have not changed.

### F. *Excusal From Jury Service for Hardship*

Defendant contends that the trial court erred by improperly excusing 229 persons from jury service in this action on the ground of undue personal hardship. (He lists a total of 325 prospective jurors and 235 hardship excusals.) The major argument is that the court used the challenged excusals to remove all persons who simply did not wish to serve in a capital case—or allowed such persons to remove themselves—and thereby created a pool of "volunteers." A minor argument is that the court generally ordered the challenged excusals without adequate support in the law or the facts or both. The claim asserts violation of California statutory and decisional law and also the United States and California Constitutions.

At defendant's request, the trial court employed the following procedure to select the jury that would try his case: examination of prospective jurors in panels, resulting in excusals for hardship; individual sequestered examination of those who remained, leading to exclusion for cause; the random drawing into the jury box of those who still remained, ending with removal on peremptory challenge by the People or defendant; and finally, the swearing of 12 jurors and 4 alternates.

Voir dire was conducted over 18 days. Initially, 325 prospective jurors were examined in 4 panels. By way of introduction, the trial court stated that the expected length of the proceedings was about 10 to 12 weeks. It went on to solicit, and determine, claims of undue personal hardship. At this stage it received 232 requests for excusal; it granted 218 and denied 14. Only then did it reveal that the action was criminal in nature and might involve the death penalty. At this stage it received, and granted, four additional requests.

The 103 remaining prospective jurors were then examined individually and in sequestration. In the course of these proceedings, the People took 11 challenges for cause, all successfully. For his part, defendant took eight challenges for cause, three successfully. The trial court removed an additional four persons for cause, two clearly on its own motion and two

apparently so. It also excused 12 more persons for hardship. Six persons did not appear.

From the 67 still remaining, prospective jurors were randomly drawn into the jury box. The People and defendant were each allotted 26 peremptory challenges against prospective jurors and 4 against prospective alternate jurors. The People used 13 such challenges against prospective jurors and 2 against prospective alternate jurors. Defendant used nine against the former and four against the latter. The jurors and alternates were sworn. Before the guilt phase opened, the trial court excused one of the jurors for hardship and substituted an alternate in his place.

In total, the trial court excused 235 persons for undue personal hardship. No objection whatever was made by either the People or defendant.

■ As stated, defendant claims that the trial court erred by improperly excusing 229 persons from jury service in this action because of undue personal hardship—220 at panel voir dire, 8 at individual sequestered voir dire, and 1 after swearing.

After close consideration, we reject defendant's claim on procedural grounds.

A defendant may properly raise in this court a point involving an allegedly improper excusal for undue personal hardship only if he made the same point below. The requirement of a contemporaneous and specific objection promotes the fair and correct resolution of a claim of error both at trial and on appeal, and thereby furthers the interests of reliability and finality. When a contemporaneous and specific objection is made, the parties are put on notice to characterize the claim as they think proper and to set out the law and facts as they deem necessary. With their response, the trial court is provided with a basis on which to define the claim and then determine whether it is meritorious and, if so, how any harm may be avoided or cured as promptly and completely as possible. On such a record, the appellate court may then decide whether a challenge to the trial court's ruling is sound. (Cf. *People* v. *Gallego* (1990) 52 Cal.3d 115, 166 [276 Cal.Rptr. 679, 802 P.2d 169] [applying the requirement of a contemporaneous and specific objection to a claim that the prosecutor used peremptory challenges to remove prospective jurors on the sole ground of group bias in violation of Cal. Const., art. I, § 16, as construed in *People* v. *Wheeler* (1978) 22 Cal.3d 258 (148 Cal.Rptr. 890, 583 P.2d 748)].)

Plainly, defendant does not satisfy the rule requiring a contemporaneous and specific objection: as noted, he made no objection whatever to any of the

trial court's hardship excusals. Nor does he show that any exception to the requirement is available. He argues that the rule does not apply to claims of error under the United States or California Constitution. We are not persuaded. The reasons for the requirement extend to all claims of whatever dimension. Its operation should therefore extend to all as well.[7]

Were we to proceed beyond the threshold, we would be inclined to reject defendant's claim on the merits. Of course, a trial court has authority to excuse a person from jury service for undue personal hardship. (Code Civ. Proc., § 204, subd. (b); see Code Civ. Proc., former § 200, added by Stats. 1975, ch. 593, § 3, p. 1310, and repealed by Stats. 1988, ch. 1245, § 1, p. 4140.) Exercise of that authority is reviewed for abuse of discretion. (See *People* v. *Wheeler, supra,* 22 Cal.3d at p. 273.)

Applying that standard, we believe that no pervasive error appears under California statutory or decisional law. Almost all of the 229 challenged excusals for undue personal hardship seem reasonable. To be sure, the trial court's examination was usually quite brief in length and often jocular in tone. Its result, however, was virtually always the sound determination of the question presented. (Compare *People* v. *Thompson* (1990) 50 Cal.3d 134, 157-159 [266 Cal.Rptr. 309, 785 P.2d 857] [arriving at a similar conclusion on a similar record].)

Read fairly and as a whole, the record does not bear out defendant's argument that the trial court used the challenged hardship excusals to remove all persons who simply did not wish to serve in a capital case—or allowed such persons to remove themselves. As the facts set out above show, the court denied 14 requests for excusal on this ground. Moreover, it ordered

---

[7]As authority for the proposition that the contemporaneous-and-specific-objection rule does not apply to claims of constitutional error, defendant cites *People* v. *Velasquez* (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341], judgment vacated and case remanded *sub nomine California* v. *Velasquez* (1980) 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042] for further consideration in light of *Adams* v. *Texas* (1980) 448 U.S. 38 [65 L.Ed.2d 581, 100 S.Ct. 2521], reiterated in its entirety (1980) 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952]. But in that case, we dealt with a narrow issue, viz., did the trial court err under the impartial-jury guaranty of the Sixth and Fourteenth Amendments to the United States Constitution by excusing a prospective juror on the People's challenge because of her views on the death penalty, in violation of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. (26 Cal.3d at pp. 436-445 (plur. opn.); see *id.* at p. 447 (conc. & dis. opn. of Newman, J.).) We held only that a defendant may properly raise such a claim whether or not he made an objection to the ruling. (*Id.* at p. 443 (plur. opn.); see *id.* at p. 447 (conc. & dis. opn. of Newman, J.).) Our holding is not inconsistent with the general applicability of the rule stated above. This is because the reasons for the requirement do not extend to this particular kind of claim: functionally, a challenge for cause by the People is similar to an objection to the subsequent excusal by the defendant—that is to say, it puts the *Witherspoon* question at issue in timely fashion.

almost all the challenged excusals—224 out of 229—*before* it revealed that the action was criminal in nature and might involve the death penalty.

Neither does the record support defendant's argument that the trial court generally ordered the challenged hardship excusals without adequate basis. The court used its practical experience and made pragmatic evaluations. As a general matter, defendant's criticism in this regard is little more than a cavil.

Of the 229 challenged hardship excusals, however, 4 are indeed troubling. In each of these instances, it appears that the trial court—although not without chastisement—did in fact allow a prospective juror to remove himself because he simply did not wish to serve. But it cannot be said that any of these persons was motivated by a desire to avoid participation *in a capital (or even a criminal) case.* Of the four prospective jurors here considered, three were excused at panel voir dire before they had even been informed of the nature of the proceedings. The fourth, it is true, was excused at individual sequestered voir dire after he received that information. But the record reveals that he acted solely out of economic considerations.

█ Further, we believe that no error appears under the United States or California Constitution. In this regard, defendant claims that the challenged excusals for undue personal hardship violated, inter alia, his rights to (1) a jury drawn from a fair cross-section of the community, under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16, of the California Constitution; (2) an impartial panel, under the same provisions; (3) a reliable determination by such a panel on the issue of life or death, under the Eighth and Fourteenth Amendments and article I, section 17; and (4) equal protection of the laws, under the Fourteenth Amendment and article I, section 7. The point rests on an assumption that all persons who did not wish to serve in a capital case were removed. The assumption is unsupported. Certainly, we cannot conclude that the pool remaining after the challenged excusals constituted "volunteers." As noted, 14 requests for excusal were denied. A fortiori, we cannot conclude that the pool constituted "volunteers" *for a capital (or even a criminal) case.* As also noted, almost all the challenged hardship excusals were made *before* the nature of the proceedings was revealed. On this record, we can find no significant infringement of defendant's fair-cross-section, impartial-jury, and reliable-penalty-determination rights. The four questionable excusals were without appreciable effect.

█ In any event, even if the trial court did in fact err as defendant claims under both California statutory and decisional law and also the

United States and California Constitutions, reversal would not be warranted. In our view, none of the asserted violations entails prejudice per se. And certainly, none discloses actual prejudice.

On the issues of both error and reversibility, defendant finds the state of the record unsatisfactory. But having made no relevant objection below, he may not be heard to complain in that regard.

### G. *Prosecutorial Misconduct*

 Defendant contends that the prosecutor committed misconduct in the course of both his opening statement and his summation. He complains of the following: a reference, in the former, to a possible witness for the People who was not ultimately called, which suggested that at some time after his arrest he had made plans to escape; and an allusion, in the latter, to the existence of facts not in evidence, to the effect that he envied Hanson. He argues that the claimed misconduct violated state law and also offended the United States Constitution—specifically, the confrontation clause of the Sixth Amendment, the cruel and unusual punishments clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment.

We reject the point on procedural grounds. "It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People* v. *Benson, supra,* 52 Cal.3d at p. 794.) In this case, defendant made no such assignment and request at any time. "It is true that the rule does not apply when the harm could not have been cured." (*Ibid.*) Such a situation, however, was not present here. The reference and allusion now complained of threatened little, if any, harm: each was brief and, in context, unremarkable. Any possible harm was readily curable. Defendant's argument to the contrary founders on the record.

### H. *Overruling of Objection to Letters*

Outside the presence of the jury, the People moved for a ruling on the admissibility of portions of four letters written by defendant in the Tokyo Detention House. Three of the letters were addressed to his wife Allison: "I am really glad Frank [Plunk, Allison's former husband,] came through, just think he might have loaned us the money all of the time." "My trip to Cal wasn't in vain. I finally found out you truly loved me and you got your bills paid. That is a pretty good haul for both of us." "I would sacrifice everything for you. Hell, look I have. Actions speak louder than words. You got the money you wanted and now you ignore my need." (See pt. II.B., *ante.*) The

fourth letter was addressed to his father: "I will probably be here til damn close to Christmas, maybe even longer. Thank you for sending my little family $4,000." The People sought (1) to show that around the time of the murder of Hanson and Blount, defendant and Allison were experiencing difficulties in their financial situation, and that defendant came to California from Japan to alleviate that condition; and (2) to corroborate the testimony of Edward Rogers on that point.

Defendant objected to the portions of the four letters as irrelevant under Evidence Code section 210 and as substantially more prejudicial than probative under Evidence Code section 352. He argued, in substance, that the evidence was of no consequence to the action, and might allow an assertedly improper inference about the provenance of the $4,000 mentioned in the letter to his father—to the effect that "the money was given to his father by Doug Mickey to send to his wife and may have come from the Eric Hanson house."

The People responded, in substance, that the portions of the four letters were relevant to the issue of motive, and were not substantially more prejudicial than probative. They offered suggestions to prevent the assertedly improper inference that defendant feared, including a statement to the jury that they were introducing the evidence only to show motive, and even an agreement not to present the portion of the letter to his father. Defendant refused.

Overruling defendant's objection, the trial court determined that the portions of the four letters were admissible. Before the jury, the prosecutor stated that the evidence "will be offered for the limited purpose of showing that Mr. Mickey and his family—Mr. Mickey's family rather in Japan were in a state of financial distress when he came to California September of 1980." Defense counsel responded: "I object to this as a conclusion on his part from what is contained in those letters. . . ." The prosecutor replied: "I will withdraw the purpose, Your Honor, that is fine." The evidence was subsequently introduced.

 Defendant now contends that the trial court erred in this matter. The appropriate standard of review for a ruling on admissibility over an objection of irrelevance and/or undue prejudice is abuse of discretion. (*People* v. *Gordon, supra*, 50 Cal.3d at p. 1239.) No abuse appears. The court could have reasonably concluded that the portions of the four letters were relevant and were not substantially more prejudicial than probative. The evidence showed motive—and did so strongly. By contrast, it supported the assertedly improper inference of provenance only weakly, if at all. Defendant argues to the contrary, but unpersuasively.

### I. *Admission of Testimony of Informer*

 Defendant contends that the trial court erred by admitting the testimony of a fellow jail inmate, who related certain extrajudicial statements he had made, including that he stabbed Blount—but only once and out of fear after she pointed a gun in his direction. He argues in substance that the introduction of the evidence under challenge was violative of various provisions of the United States and California Constitutions and assorted prophylactic rules thereunder as the assertedly tainted fruit of the allegedly poisonous tree comprising his "inflight" and "Honolulu admissions" to Detective Landry. (See pt. II.A., *ante.*)

We reject the claim. "It is, of course, 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' " (*People* v. *Benson, supra,* 52 Cal.3d at p. 786, fn. 7, quoting *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) At trial, defendant failed to make any objection whatever. He now argues that the rule is not applicable here. He asserts that any objection would have been futile. We disagree: futility simply does not appear. He also asserts in effect that the rule is in conflict with, and must yield to, his Eighth Amendment right to a reliable penalty determination and the state's independent interest in the reliability of such a determination. Again we disagree: no significant conflict appears. (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1255.) In any event, defendant's point is lacking in merit. No poison, no taint. (See pt. II.A., *ante.*)

### J. *Instruction on Proof of Intent*

The trial court instructed the jury, inter alia, that a defendant is presumed innocent and that the People have the burden of proving him guilty beyond a reasonable doubt.

The court then defined the offenses of murder, manslaughter, burglary, and robbery; the special circumstances of multiple murder, intentional murder for financial gain, felony-murder-burglary and felony-murder-robbery; and the act and mental state, including specific intent, requisite to each.

Further, the court instructed on the defenses of diminished capacity and voluntary intoxication, and on their availability if a reasonable doubt exists as to the presence of certain required mental states.

The court also explained how intent is shown, in accordance with the standard instruction (which was subsequently withdrawn) set out in former

CALJIC No. 3.34 (4th ed. 1979 (1979 rev.)): "The intent with which an act is done is shown as follows: By a statement of his intent made by a defendant. By the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act. For the purposes of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct which, it is charged, constituted the crime described in the information." (Brackets and paragraphing omitted.)

▆▆▆ Defendant contends that the instruction on proof of intent—specifically, its "presumption of mental soundness"—was erroneous. He argues in substance as follows: the language under challenge created a mandatory conclusive presumption that reduced the People's burden of proof as to the mental elements of the applicable offenses and special circumstances by undermining the defenses of diminished capacity and voluntary intoxication; and such a reduction in burden is impermissible under the due process clause of the Fourteenth Amendment to the United States Constitution.

When a determination of error depends on the meaning communicated by an instruction, we must ascertain how a hypothetical "reasonable juror" would have, or at least could have, understood the words in question. (See *Cage* v. *Louisiana* (1990) 498 U.S. __, __ [112 L.Ed.2d 339, 341-342, 111 S.Ct. 328, 329] (*per curiam*) ["could have"]; *Francis* v. *Franklin* (1985) 471 U.S. 307, 316 [85 L.Ed.2d 344, 354, 105 S.Ct. 1965] [same]; *People* v. *Warren, supra,* 45 Cal.3d at p. 487 ["would [have]"]; cf. *Boyde* v. *California* (1990) 494 U.S. 370, 378, 380 [108 L.Ed.2d 316, 328, 329, 110 S.Ct. 1190, 1197, 1198] [holding that "[t]he legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence" under the Eighth Amendment "is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of" such evidence].) To do so, we must obviously consider the language both in itself and in the charge as a whole.

We find no error. On this record, a reasonable juror would have understood the presumption of mental soundness for what it was, i.e., a presumption of *sanity*. Sanity, of course, was not at issue. Such a presumption could not have reduced the People's burden of proof as to the mental elements of the applicable offenses and special circumstances. Through the instructions as a whole, the jury was directed to take into account all the evidence introduced by both the parties bearing on the presence or absence of the mental elements, and to decide the question on that basis. Certainly, the presumption could not have undermined the defenses of diminished capacity and voluntary intoxication. It must be recalled that defendant relied on voluntary intoxication and diminished capacity *as a result of voluntary*

*intoxication.* Defendant's "mental soundness"—as a reasonable juror could have understood the phrase—was simply not at issue. Defense counsel conceded as much in his summation: "There is no evidence here of mental illness or mental defect . . . ." The presumption, therefore, could not have had any appreciable effect on the defenses actually presented. It is true that whether defendant was intoxicated was indeed in dispute. ██ ██ But—contrary to what appears to be defendant's argument—a reasonable juror could not have discerned in the presumption of mental soundness a presumption of sobriety.[8]

## K. *Instruction on Consciousness of Guilt*

The trial court instructed the jury, in accordance with the standard instruction set out in CALJIC No. 2.03 (4th ed. 1979 (1979 rev.)), as follows: "If you find that before this trial the defendant made false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

Subsequently, in *People* v. *Louis* (1984) 159 Cal.App.3d 156, 161 [205 Cal.Rptr. 306], the Court of Appeal stated: "[T]he instruction should only be given when the statement is found to be deliberately false. [Citations.] [¶] A

---

[8]In a related point, defendant claims for the first time in his reply brief that the trial court erred by instructing the jury as it did on voluntary manslaughter and the defense of honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or limb.

In accordance with the standard instruction set out in CALJIC No. 8.40 (4th ed. 1979 (1979 re-rev.)), the trial court declared in pertinent part: "The crime of voluntary manslaughter is the unlawful killing of a human being without malice aforethought when there is an intent to kill. There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion, or in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury. In order to prove the commission of the crime of voluntary manslaughter, each of the following elements must be proved: 1. That a human being was killed, 2. That the killing was unlawful, and 3. That the killing was done with the intent to kill." (Brackets and paragraphing omitted.)

We believe that the trial court adequately instructed on voluntary manslaughter and the honest-but-unreasonable-belief defense. Defendant essentially concedes that the instruction quoted above was proper. But he goes on to argue that certain others were not. In our view, any and all of the defects that he assertedly uncovers are, in context, relatively minor and without notable significance. It may perhaps be argued that the other instructions of which defendant complains had a potential to merge the defense of sudden quarrel and heat of passion into that of honest but unreasonable belief. But the applicable defense actually put forth by defendant was to the effect that he was led to entertain an honest if unreasonable belief in the need for self-defense as a result of a sudden quarrel and in the heat of passion. Accordingly, we cannot conclude that defendant was denied the honest-but-unreasonable-belief defense or deprived of its benefits.

statement can be false without being made wilfully or deliberately. CALJIC No. 2.03 would be more accurate if it included the word 'wilfully' between the words 'made' and 'false'. . . . ." That same year, the standard instruction was revised accordingly. So revised, it is presently set out in CALJIC No. 2.03 (5th ed. 1988.)

■ Defendant contends that the instruction given at his trial was erroneous. He argues in substance that without the adverb "wilfully," the jury might have construed "false" as merely "mistaken" and on that basis might have made an inference of consciousness of guilt that was in fact unsupported .

We disagree. We believe that on this record at least, a reasonable juror would have understood the adjective "false" as "*wilfully* false"—and could not have construed it as merely "mistaken." In common usage, one of the primary meanings of "false" is "intentionally untrue." (Webster's New Internat. Dict. (3d ed. 1961) p. 819.) In the instruction under challenge, that meaning is suggested by the word's pairing with the adjectival phrase that follows: "false *or deliberately misleading.*" (See *People* v. *Louis, supra,* 159 Cal.App.3d at p. 162.) In the case as it was actually tried, the meaning suggested was in fact confirmed. The People's position was that certain of defendant's extrajudicial statements were "intentionally untrue." By contrast, defendant's position was essentially that the statements in question were "true." Neither party urged that the statements were merely "mistaken."[9]

L. *Instructions on Lesser Included Offenses and Partial Verdicts as to Homicide*

The trial court instructed the jury, in accordance with the standard instruction set out in CALJIC No. 17.10 (4th ed. 1979 (1982 rev.)), that it could find defendant not guilty of murder but guilty of the lesser included offenses of voluntary or involuntary manslaughter. It also told the panel, in conformity with CALJIC No. 8.75 (4th ed. 1979 (1982 new)), that it could return partial verdicts as to homicide.

Following our decision in *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809], we held in *People* v. *Kurtzman* (1988) 46 Cal.3d 322, 324-325 [250 Cal.Rptr. 244, 758 P.2d 572], that a trial court may

[9]We agree with *Louis* that when the adverb "wilfully" is inserted, an instruction in accordance with CALJIC No. 2.03 becomes "more accurate." (159 Cal.App.3d at p. 161.) But we do not agree that without the word, such an instruction is ipso facto erroneous. To the extent that it so holds (see *id.* at p. 162), *Louis* is inconsistent with the analysis set forth above and, for that reason, is hereby disapproved.

"restrict[ ] a jury from *returning a verdict* on a lesser included offense before acquitting on a greater offense" but may not "preclude a jury from *considering* lesser offenses during its deliberations." (Italics in original.)

■ Defendant contends that by instructing the jury as it did, the trial court erred under state law as well as the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, including the impartial-jury-trial and due process clauses. Crucial to his claim is the assertion that the instructions in question "disrupt[ed] and coerc[ed] the jury's consideration of the evidence bearing on [his] specific intent."

The claim is without merit. In our view, defendant's assertion is unsound. On this record, a reasonable juror would have understood the challenged instructions to govern how the panel was to return its verdicts on homicide, and not to affect how it was to deliberate on the matter. Certainly, such a juror could not have construed the charge so as to interfere in any significant way with his consideration of the evidence. (Compare *People* v. *Adcox* (1988) 47 Cal.3d 207, 241-242 [253 Cal.Rptr. 55, 763 P.2d 906] [rejecting a claim of error against similar instructions].)

Defendant argues to the contrary, but he is unpersuasive. Contrary to his position, the peculiar circumstances of his particular trial do not undermine our conclusion. Neither do any other factors.[10]

M. *Instructions on Defendant's Failure to Testify*

At defendant's request, the trial court instructed the jury, in accordance with the standard instruction set out in CALJIC No. 2.60 (4th ed. 1979 (1979 rev.)), that "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. You must not draw any inference from the fact that he does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way." Immediately thereafter, also at defendant's request, the court told the panel, in conformity with CALJIC No. 2.61 (4th ed. 1979 (1979 rev.)), that "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a

---

[10]We recognize that in *People* v. *Kurtzman, supra,* 46 Cal.3d at page 336, we broadly stated that instructions like those under challenge here "may confuse jurors . . . as to how deliberations should proceed," "may create ambiguity as to just what is prohibited and what is required," and are "potentially misleading." Whatever its validity in the abstract, that statement does not affect our view as to how a reasonable juror would have, or could have, understood the instructions actually given in this case. (Compare *People* v. *Hunter* (1989) 49 Cal.3d 957, 976 [264 Cal.Rptr. 367, 782 P.2d 608] [concluding to similar effect on the record there considered]; *People* v. *Hernandez* (1988) 47 Cal.3d 315, 352 [253 Cal.Rptr. 199, 763 P.2d 1289] [same].)

reasonable doubt every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support a finding against him on any such essential element."

 Defendant contends that the trial court erred by instructing the jury as it did. His attack is focused on the verb "supply." He argues in substance that the sense demanded of "supply" by the applicable law is "make up or compensate for"; the word does not convey that meaning; and whatever sense, if any, it does in fact communicate renders the instructions in question improper or inadequate statements of the relevant law, and also gives rise to prejudice in itself and compounds prejudice arising elsewhere.

The claim lacks merit. Defendant's assertion to the contrary notwithstanding, a reasonable juror would in fact have understood the verb "supply" to mean "make up or compensate for." We acknowledge that such a meaning appears to be obsolescent. (Compare Webster's New Internat. Dict. (2d ed. 1941) p. 2534 [listing "[t]o make up or compensate for" as one of the definitions of "supply"], with Webster's New Internat. Dict. (3d ed. 1961) p. 2297 [not listing that definition *in ipsissimis verbis*].) But it is plainly not obsolete. (See Webster's New Internat. Dict. (3d ed. 1961) p. 2297.) More important, it is practically compelled by the context. In any event, we do not believe that a reasonable juror could have derived an improper or inadequate understanding of the pertinent law. Accordingly, we need not, and do not, consider the issue of prejudice.[11]

### N. *Failure to Instruct on Testimony of Informer*

 The trial court did not instruct the jury that they should consider the testimony of an informer to be inherently unreliable and that they should view it with caution.

Defendant now contends that the trial court's failure to so instruct, even absent a request, was error. He argues that at least when, as here, a man's life is at stake, such an instruction is required by state law and, apparently, by the due process clause of the Fourteenth Amendment to the United States Constitution.

We reject the claim. We have repeatedly held that a court does not err by failing to instruct the jurors, sua sponte, to consider an informer's testimony to be inherently unreliable and to view it with caution. (E.g., *People v. Bonin*

---

[11]We note in passing that the verb "supply" has been replaced with "make up for" in CALJIC No. 2.61 (5th ed. 1988 (1990 rev.)).

(1989) 47 Cal.3d 808, 849 [254 Cal.Rptr. 298, 765 P.2d 460].) We have also held, impliedly but clearly, that even in a capital case such an instruction is not required by California statutory or decisional law (see *People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776]) or by the guaranty of due process of law of either the Fourteenth Amendment to the United States Constitution or article I, sections 7 and 15, of the California Constitution (see *People* v. *Malone* (1988) 47 Cal.3d 1, 27 [252 Cal.Rptr. 525, 762 P.2d 1249]).

O. *Failure to Instruct on Concurrence of Act and Intent and on Diminished Capacity and Voluntary Intoxication With Regard to Burglary and Robbery*

As indicated above, defendant was charged with the murder of Hanson and Blount, but not with burglary or robbery; he was alleged to have committed the crimes under special circumstances including felony-murder-burglary and felony-murder-robbery; at trial, the People sought to prove that the charged murders were in the first degree on theories of wilful, deliberate, and premeditated murder and also felony-murder-burglary and felony-murder-robbery.

The trial court generally instructed the jury on homicide, including first degree wilful, deliberate, and premeditated murder; first degree felony murder in the course of a burglary or robbery; second degree murder; voluntary manslaughter; and involuntary manslaughter. It also declared that for murder there must exist a concurrence of act and intent. It then defined the defenses of diminished capacity and voluntary intoxication for murder (with the exception of first degree felony murder) and voluntary manslaughter. It did not, however, instruct the jury as to the necessity for the concurrence of act and intent, or the availability of the defenses of diminished capacity and voluntary intoxication, for burglary and robbery—which underlay first degree felony murder and the felony-murder special circumstances.

Defendant contends that the trial court's failure to instruct on these matters was erroneous. We agree. "It is, of course, virtually axiomatic that a trial court must correctly instruct on such legal principles as are applicable to the evidence [citation]—and on such legal principles alone. The failure or refusal to do so constitutes error." (*People* v. *Benson, supra,* 52 Cal.3d at p. 799.) Here, the necessity for the concurrence of act and intent for burglary and robbery, and the availability of the defenses of diminished capacity and voluntary intoxication for those same offenses, were applicable to the evidence. By failing to instruct thereon, the court erred.

Each of the errors, however, implicates state law only. Defendant claims, to the contrary, that the instructional omissions are violative of the due process clause of the Fourteenth Amendment to the United States Constitution. His point is predicated on the assertion that, separately or together, the errors effectively reduced the People's beyond-a-reasonable-doubt burden of proof as to the intent element of the burglary and robbery predicates of first degree felony murder and the felony-murder special circumstances. The assertion is unsupported. The instructions actually given clearly communicated to a reasonable juror that the People were required to prove the required intent beyond a reasonable doubt.

We now turn from the fact of error to its consequences. ▇▇▇ "It is the general rule for error under state law that reversal requires prejudice and prejudice in turn requires a reasonable probability of an effect on the outcome." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1253.) That rule is plainly applicable here. Defendant claims, to the contrary, that the instructional omissions are subject to harmless-error analysis under the "reasonable doubt" standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. His basis is that the errors are of federal constitutional dimension. But as shown above, that basis is unsound.

▇▇▇ We are of the opinion that there is no need to reverse defendant's conviction for first degree murder or to set aside either of the felony-murder special-circumstance findings. We come to that conclusion whether we employ the applicable, and more tolerant, "reasonable probability" test or the inapplicable, and less tolerant, "reasonable doubt" test.

The omission of an instruction requiring the concurrence of act and intent for burglary and robbery could not have significantly affected the result. A reasonable juror would have understood from the charge as a whole that for burglary and robbery there must exist a concurrence of act and intent, and could not have believed otherwise. That message was all but express in the instructions defining burglary and robbery as well as in the instructions dealing with the requisite specific intent to commit burglary and robbery as the predicate felony in first degree felony murder.

Neither could the result have been significantly affected by the omission of an instruction on the availability of the defenses of diminished capacity and voluntary intoxication for burglary and robbery. As noted, defendant relied on voluntary intoxication and diminished capacity as a result of voluntary intoxication. A reasonable juror would have effectively given consideration to these defenses through the instructions dealing with the requisite specific intent to commit burglary and robbery. Under the charge as

a whole, and in light of the evidence the parties adduced and the arguments they presented, such a juror could not have inferred that the issue of voluntary intoxication—on which both of the defenses rested—was somehow immaterial to the question of the presence *vel non* of specific intent to commit burglary or robbery.

Contrary to defendant's assertion, there was no reduction in the People's beyond-a-reasonable-doubt burden of proof attributable to the errors, whether considered by themselves or in conjunction with any others. Nor was there any other prejudicial effect flowing from the instructional omissions.

 In view of the foregoing, we are of the opinion that the errors were harmless beyond a reasonable doubt and, a fortiori, do not support a reasonable probability of an effect on the outcome.[12]

### P. *"Cumulative Prejudice"*

Defendant contends that the effect of the errors we have found, when considered together, is prejudicial. We disagree.

### III. DEATH-ELIGIBILITY ISSUES

Defendant does not effectively challenge the determination that he was subject to the death penalty. As relevant here, death eligibility is established when the defendant is convicted of murder in the first degree under at least one special circumstance. (Pen. Code, § 190.3.) Defendant was so convicted. As shown above, he has not successfully attacked the jury's guilty verdicts. It will be recalled that the jury made the following special circumstance findings as to each of the two murders: multiple murder; intentional murder for financial gain; felony-murder-robbery; and felony-murder-burglary. Defendant essentially concedes, as he must, that at least one of these findings— which deals with multiple murder—is valid. We shall proceed to consider his claims because, as will appear, they bear on the question of penalty.

---

[12]Defendant claims error in the failure by the People to separately charge and prove the offenses of burglary and robbery. He argues that separate charging and proof is required. He is wrong. There is no such requirement insofar as the crimes in question underlie first degree felony murder. (E.g., *People* v. *Morris* (1988) 46 Cal.3d 1, 14 [249 Cal.Rptr. 119, 756 P.2d 843].) Neither is there any such requirement insofar as they underlie a felony-murder special circumstance. (*Id.* at pp. 14-18.) Therefore, the People's failure in this regard was not erroneous. Without error, of course, there can be no prejudice.

### A. Multiple-murder Special Circumstances

■ Defendant attacks the "multiple" multiple-murder special-circumstance findings. He contends that any one case can support only one such finding as a matter of law. We agree. (E.g., *People v. Anderson* (1987) 43 Cal.3d 1104, 1150 [240 Cal.Rptr. 585, 742 P.2d 1306].) Accordingly, one of the findings here must be set aside.

### B. Intentional-murder-for-financial-gain Special Circumstances

■ Defendant attacks the intentional-murder-for-financial-gain special-circumstance findings. He contends, inter alia, that the evidence in support is insufficient.

In *People v. Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], in order to avoid overlap with the felony-murder special circumstance, we construed the intentional-murder-for-financial-gain special circumstance to apply "only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." Subsequently, in *People v. Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279], we clarified our construction by stating that "the relevant inquiry is whether the defendant committed the murder in the expectation that he would *thereby* obtain the desired financial gain" (*id.* at p. 409, italics added)—as, for example, in the killing of a victim in a murder for hire (*id.* at p. 410), or in an attempt to secure the proceeds of a life insurance policy covering the victim (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1178 [259 Cal.Rptr. 701, 774 P.2d 730]) or to avoid a debt owing to the victim (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1025 [254 Cal.Rptr. 586, 766 P.2d 1] (lead opn. of Kaufman, J.)).

■ In reviewing the sufficiency of evidence for a special circumstance, the question we ask is whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt. (E.g., *People v. Benson, supra,* 52 Cal.3d at p. 785.)

■ In our judgment, no rational trier of fact could have so found on this record. The evidence establishes beyond peradventure that defendant committed the murder of Hanson and Blount squarely under the special circumstances of felony-murder-burglary and felony-murder-robbery. Neither death was "the consideration for, or an essential prerequisite to," any "financial gain" he may have sought. (*People v. Bigelow, supra,* 37 Cal.3d at p. 751.) Nor did he perpetrate either offense "in the expectation that he

would *thereby* obtain" any "financial gain." (*People* v. *Howard, supra*, 44 Cal.3d at p. 409, italics added.)

Accordingly, the intentional-murder-for-financial-gain special-circumstance findings are not supported by sufficient evidence and hence must be set aside. (Compare *People* v. *Adcox, supra*, 47 Cal.3d at p. 246 [arriving at the same conclusion on similar facts].)

### C. *Felony-murder Special Circumstances*

Defendant attacks the felony-murder-burglary and the felony-murder-robbery special-circumstance findings. He contends that the trial court committed various instructional errors relating directly to these findings. We have addressed his claims above, and have found them wanting. (See pts. II.J. & II.O., *ante.*)

## IV. PENALTY ISSUES

Defendant raises a number of claims challenging the judgment as to penalty. As will appear, none is meritorious.

### A. *Excusal of Prospective Jurors Because of Views on the Death Penalty*

Defendant contends that the trial court erred under the impartial-jury guaranty of the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16, of the California Constitution when it excused eight prospective jurors because of their unfavorable views on the death penalty: Mary Anne Sayler, Helen Marie Charles, Richard A. Paroli, Curry R. Jackson, Sr., Marina E. Christman, Barbara J. Lee, Robert Hopkins, and Clementene McMillan.

In *Witherspoon* v. *Illinois, supra*, 391 U.S. 510, the United States Supreme Court implied that a prospective juror could not be excused for cause without violating a defendant's federal constitutional right to an impartial jury unless, as relevant here, he made it "unmistakably clear" that he would "*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [the juror] . . . ." (*Id.* at p. 522, fn. 21 [20 L.Ed.2d at p. 785], italics in original.) In *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], the court "clarif[ied]" *Witherspoon* and declared that the proper standard was "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424 [83 L.Ed.2d at pp. 851-852].) On

this point, *Witt* followed the teaching of *Adams* v. *Texas, supra,* 448 U.S. 38, and in fact quoted from that opinion at page 45 of 448 U.S. [65 L.Ed.2d at page 589]. In *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250], we adopted the *Witt* standard as the test for determining whether a defendant's state constitutional right to an impartial jury was violated by an excusal for cause.

As stated, defendant claims the trial court erred by excusing for cause prospective jurors Sayler, Charles, Paroli, Jackson, Christman, Lee, Hopkins, and McMillan. At individual sequestered voir dire, the People challenged each of the foregoing persons for actual bias arising from his or her scruples against capital punishment. Defendant presented opposition, expressly or impliedly. The court sustained the challenges. The issue of excusal was litigated in light of *Witherspoon* and its reading of the impartial-jury guaranty of the Sixth and Fourteenth Amendments. Defendant made reference to the California Constitution—albeit only in a general manner—when he presented his opposition to the People's challenges to each of the prospective jurors in question save Sayler.

There was no error. The trial court impliedly determined that each of the prospective jurors in question had views on the death penalty that would prevent or substantially impair the performance of his or her duties as a juror. The standard of review is substantial evidence. (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1262.) Under that standard, each of the court's determinations is sound. The record contains more than substantial evidence in support. Sayler stated she would not vote for death under any circumstances. Charles made assertions to the same effect. Paroli repeatedly said he would not and could not impose the ultimate sanction. Johnson said the same. Christman made it plain by the end of her voir dire that she could not consider death. Lee declared her unwillingness and inability to vote to take a life throughout her examination. So too did Hopkins. McMillan did as well. That the court did not make its determinations in light of *Witt* does not deprive them of validity.

Defendant argues to the contrary. He maintains that we should adhere to the *Witherspoon* standard. But as a matter of federal constitutional law we cannot, and as a matter of state constitutional law we will not.

Defendant then maintains that the *Witt* standard may not, or should not, be applied when as here the excusal in question antedates the opinion from which the test derives. In *People* v. *Gallego, supra,* 52 Cal.3d at page 192, and *People* v. *Wright* (1990) 52 Cal.3d 367, 418, footnote 16 [276 Cal.Rptr. 731, 802 P.2d 221], we concluded that such an assertion is without merit. We adhere to that conclusion in this case. Defendant urges in substance that the

*Witt* standard was unforeseeable at the time of voir dire in this case and hence that its use now does violence to principles of due process of law and fundamental fairness that are of federal and state constitutional dimension. But as noted above, *Witt* followed the teaching of *Adams*. And *Adams* was decided in 1980, almost three years *before* voir dire below.[13] It might perhaps be argued that the *Witt* standard was not foreseeable as the test for determining whether a defendant's *state* constitutional right to an impartial jury was violated by an excusal for cause. But any such unforeseeability cannot be deemed significant here.

Finally, defendant maintains that the trial court's excusal of prospective juror Sayler for cause is not supported by a record that can be deemed legally sufficient. He urges that the People's examination of Sayler was "improper and inherently likely to lead to an unreliable response." We disagree. The court's ruling was indeed supported by a legally sufficient record. Moreover, nothing in the People's examination was improper.[14]

B. *Refusal to Excuse Prospective Juror Because of Views on the Death Penalty*

Defendant contends that the trial court erred under former Penal Code section 1073 (Code Amends. 1873-1874 (Pen. Code) ch. 614, § 56, pp. 441-442) and also, inter alia, the impartial-jury guaranty of the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16, of the California Constitution when it refused to excuse prospective juror Jose J. Perez because of his favorable views on the death penalty.

---

[13]True, in *People* v. *Velasquez, supra,* 28 Cal.3d 461, 462 (*per curiam*), we stated that *Adams* did not "alter" a finding of *Witherspoon* error that we had made in *People* v. *Velasquez, supra,* 26 Cal.3d 425, which *sub nomine California* v. *Velasquez, supra,* 448 U.S. 903, the United States Supreme Court subsequently vacated and remanded for further consideration in light of *Adams*. Our statement, of course, did not alter *Adams*'s plain words or their clear meaning.

[14]In *People* v. *Kaurish* (1990) 52 Cal.3d 648, 699 [276 Cal.Rptr. 788, 802 P.2d 278], we stated that "The real question [under *Witt*] is whether the juror's attitude will ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' [Citation.] A prospective juror personally opposed to the death penalty may nonetheless be capable of following his oath and the law. A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict." Read reasonably and in context, the final sentence is to the following effect: "A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude, *or appreciably impede*, him from engaging in the weighing process and returning a capital verdict."

At individual sequestered voir dire, defendant challenged prospective juror Perez for actual bias arising out of his support for capital punishment. The People presented opposition. The court overruled the challenge. Subsequently, the 12 jurors were selected and sworn. Neither the People nor defendant exhausted the 26 peremptory challenges allotted to each side; neither party expressed any dissatisfaction with the panel. The four alternates were then selected and sworn. The People did not exhaust their four peremptory challenges, but defendant did; again, neither party expressed any dissatisfaction. Perez was not among those chosen to serve. He had not been drawn into the jury box as a potential juror. He had, however, been called as a potential alternate, but was removed by defendant's second peremptory challenge. Before the guilt phase opened, the court excused one of the jurors for hardship and randomly selected alternate Sarah J. Quinn to take his place. Quinn had been the last person drawn as a potential alternate, and the only person drawn after defendant had exhausted his peremptory challenges. At individual sequestered voir dire, defendant had expressly passed Quinn for cause. Apparently, at no time did he manifest any concern whatever about her fairness or impartiality.

Defendant claims that the trial court erred by overruling his "for cause" challenge against prospective juror Perez. For purposes here, we shall assume the court did indeed err. But as will be shown, reversal is not required.

 "It appears that with the exception of an improper '*Witherspoon* exclusion' "—which, of course, is not presented here—"an erroneous ruling on a 'for cause' challenge is not automatically reversible but is subject to scrutiny for prejudice under harmless-error analysis." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1247.) This principle applies generally: it matters not whether the error merely offends state law or amounts to a violation of the United States Constitution. (See *ibid.*) Prejudice turns on whether the defendant's right to a fair and impartial jury was affected. That is certainly true when state law is implicated. (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1087 [259 Cal.Rptr. 630, 774 P.2d 659].) It is also true, we believe, when a federal constitutional violation is involved. State-law error of this sort, bearing as it does on penalty in a capital case, is reviewed under the "reasonable possibility" standard of *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135]. Error of federal constitutional dimension, by contrast, is scrutinized under the "reasonable doubt" standard of *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 768 [251 Cal.Rptr. 83, 759 P.2d 1260].)

 After review, we can discern no prejudice flowing from the assumedly erroneous overruling of defendant's "for cause" challenge against

prospective juror Perez—whether any error involves state law only or amounts to a federal constitutional violation. It is evident that defendant's right to a fair and impartial jury was not affected thereby. Perez did not sit on the jury. On this record, he could not have tainted the panel's members with his alleged bias. Accordingly, he could not have influenced the process or result of the deliberations.

Defendant disagrees with our conclusion that reversal is not required. He may be understood to argue against the applicability of harmless-error analysis. He is too late. Such a point has already been rejected. (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1247.) He then argues that he did indeed suffer prejudice. We cannot agree. That he was "compelled" to use a peremptory challenge against Perez as a potential alternate, subsequently exhausted his allotment, had no peremptory challenge remaining to use against Quinn, and finally saw Quinn placed on the jury, does not support an inference that his right to a fair and impartial jury was affected in any way. *People* v. *Helm* (1907) 152 Cal. 532 [93 P. 99], on which he relies, provides no support. There, this court held that "the erroneous overruling of a good challenge for cause, thereby compelling the use of a peremptory challenge, is not prejudicial error where"—as here—"it is not made to appear that the challenger was obliged afterward to accept an objectionable juror, without power to use a peremptory challenge upon him . . . ." (*Id.* at p. 535.)

### C. *Denial of Motion to Strike the Testimony of the People's Witnesses*

At the penalty phase, the People called two witnesses in its case-in-chief, Nancy Tall and Rochelle Schreiber. Each had formerly been married to defendant. Each testified to conduct on his part that the People claimed amounted to "other [violent] criminal activity" within the meaning of Penal Code section 190.3 (hereafter section 190.3), viz., assault and/or battery.

Specifically, Tall related a single incident: once, in the course of an argument, defendant went to strike her and she twisted away and dislocated her shoulder. Her testimony was brief, filling fewer than five pages of reporter's transcript on direct examination and fewer than two on cross-examination.

Schreiber related three incidents: on one occasion, during an argument, defendant "slapp[ed] me around"; on another, defendant and her brother got into fist fight, which she ended by firing a gunshot into the air; later, he became "mad because I fired the gun and afraid if they didn't stop fighting I would have shot him," and proceeded to "kind of bop[ ] my head a couple

of times." Her testimony too was brief, filling about nine pages on direct examination and about four on cross-examination.

More than a week after Tall and Schreiber had been on the stand, defendant made an oral motion, outside the presence of the jury, to strike their testimony. His grounds were two in number. The first was that the evidence was inadmissible under the notice requirement of section 190.3 because the People did not give "formal" notice. The second was that the evidence was also inadmissible under the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution, because each of those guaranties bars introduction of unadjudicated criminal activity.

After a hearing, the trial court denied the motion. Defendant requested permission to file moving papers. The court refused.

Defendant now contends that the trial court erred by denying his motion to strike the testimony of Tall and Schreiber. As stated above, a ruling on a motion such as the present, which concerns the admissibility of evidence, is apparently subject to review for abuse of discretion.

The trial court did in fact err by denying the motion insofar as it was based on the notice requirement of section 190.3. The statutory provision declares in pertinent part that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, *prior to trial*." (Italics added.) In *People v. Daniels* (1991) 52 Cal.3d 815, 879 [277 Cal.Rptr. 122, 802 P.2d 906], we construed the italicized phrase to mean "before the cause is called for trial."[15] Here, the People did not give any notice before such time.

Reversal, however, does not follow. Clearly, the "reasonable possibility" standard of *People v. Brown, supra,* 46 Cal.3d 432, 446-448, which applies to "state-law error at the penalty phase of a capital trial" (*id.* at p. 448), applies here. (See *People v. Taylor* (1990) 52 Cal.3d 719, 737 [276 Cal.Rptr. 391, 801 P.2d 1142].) Under that test, the error is harmless. The testimony of Tall and Schreiber brought no appreciable weight to the balance of aggravation and mitigation. In his summation, the prosecutor expressly conceded that the evidence in question was "[v]ery minimal." No reasonable juror could have disagreed.

---

[15]We recognize that certain language in *People v. Brown, supra,* 46 Cal.3d at page 459, may perhaps be read to suggest that for purposes of section 190.3, trial begins sometime *after* the cause is called. Following *Daniels,* that language is no longer viable.

By contrast, the trial court did not err by denying the motion insofar as it was based on the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution. Contrary to defendant's assertion, neither the federal nor state guaranty bars introduction of unadjudicated criminal activity. (See *People* v. *McDowell* (1988) 46 Cal.3d 551, 569 [250 Cal.Rptr. 530, 758 P.2d 1060] [considering both the federal and state constitutional provisions], following *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480]; see also *People* v. *Benson, supra,* 52 Cal.3d at p. 789 [considering only the federal provision].)

Defendant also claims that the trial court erred by denying his motion insofar as it was based on such grounds as the following: (1) the evidence was inadmissible because it did not show "other [violent] criminal activity" within the meaning of section 190.3; (2) the evidence was inadmissible under section 190.3 as well as the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution, and the cruel and unusual punishments clauses of the Eighth Amendment and article I, section 17, because any "other [violent] criminal activity" it might have shown was beyond the applicable period of limitations; and (3) the evidence was inadmissible because it was substantially more prejudicial than probative under Evidence Code section 352.

We reject the point on procedural grounds. As stated above, the rule is that a defendant may not complain on appeal that evidence was inadmissible on a certain ground if he did not rely on that ground in a timely and specific fashion in the trial court. At trial, defendant did not rely on a basis other than the notice requirement of section 190.3 and the "bar" against the introduction of unadjudicated criminal activity he claimed to discover in the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15. We discern no exception to the applicability of the foregoing rule here. All the same, we note that in *People* v. *Jennings* (1988) 46 Cal.3d 963, 982 [251 Cal.Rptr. 278, 760 P.2d 475], we held that "section 190.3 does not contemplate limitation of such evidence to crimes for which prosecution is not barred by the applicable statute of limitations."

D. *Denial of Motion to Bar Expert's Testimony in Rebuttal*

At the penalty phase, defendant called two experts in his case-in-chief: Dr. David Smith, a physician with specialties in clinical toxicology and addictionology, and Dr. Jules Burstein, a clinical psychologist with a specialty in forensic psychology. Each opined that at the time of the murder of Hanson and Blount, as a result of both psychopathology and long-term and heavy

polysubstance abuse, defendant did not have the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law—or at best, any capacity he may have had was "severely" or "significantly" impaired. Each expert's opinion was based in large part on information provided by defendant himself.

The People called an expert in rebuttal: Dr. Kate B. Yago, a psychiatrist with a specialty in polysubstance abuse.

Before Dr. Yago took the stand, defendant moved, outside the presence of the jury, to bar her from testifying. At bottom, his grounds were in substance that any opinion she might have formed was inadmissible under sections 801 et seq. of the Evidence Code, which deal with expert opinion testimony.

Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter . . . , whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

Evidence Code section 802 declares: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. . . ."

Evidence Code section 803 states: "The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion. . . ."

In his motion, defendant argued in substance as follows: Dr. Yago's opinion was based in some part on matter derived from a telephone interview with Allison, who by then had divorced him and remarried—viz., information about his drug history; and that such matter was not the kind on which an expert might reasonably rely in forming an opinion as to his mental condition.

The People opposed the motion, conceding the first point in defendant's argument but denying the second. They also represented that they intended to introduce the information provided to Dr. Yago by Allison—but only for

the partial basis of Dr. Yago's opinion, and not for the truth of the information itself.

After a hearing, the trial court denied defendant's motion. Implicit in its ruling was a determination that the "matter" Dr. Yago derived from her interview with Allison was in fact "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject" of defendant's mental condition. (Evid. Code, § 801, subd. (b).)

Dr. Yago subsequently took the stand in the presence of the jury. She opined to the effect that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not impaired at the time of the offenses. She stated in substance that she based her opinion on matters including the following: defendant's "Honolulu admissions"; various letters by defendant; a letter by Allison; crime scene and autopsy photographs; property taken from the Hanson residence; certain statements by various witnesses; certain testimony by Edward Rogers; a substance abuse history prepared by Dr. Smith from information provided by defendant; the entire testimony of both Drs. Smith and Burstein; and the interview with Allison.

As the prosecutor began to ask Dr. Yago questions to elicit the matter she had derived from her interview with Allison, "solely"—he stated—"for the purposes and the basis of this expert's opinion," defense counsel interjected, "Renew our objection, Judge, at this time," and the trial court responded, "All right, overruled." Before Dr. Yago responded, the court instructed the jury that "the testimony of the doctor as to any information she received on the telephone" from Allison "is not being offered for the truth of the matter asserted. It is only being offered for the purposes of why the doctor has come to the conclusion that the doctor has come to . . . ." (Paragraphing omitted.)

Under the prosecutor's questioning, Dr. Yago proceeded to summarize the information Allison provided—to the effect that in the period from about February 1978 until September 1980, defendant did indeed engage in some polysubstance abuse but not heavily. At one point in the course of her direct testimony she conceded that "perhaps the drug history I got from Allison is very incomplete . . . ."

 Defendant now contends that the trial court erred by denying his motion to bar Dr. Yago from testifying in rebuttal.

The crucial issue here is whether the "matter" Dr. Yago derived from her interview with Allison—viz., information about defendant's drug history—

was "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject" of his mental condition. (Evid. Code, § 801, subd. (b).) As noted, the trial court impliedly resolved that question in the affirmative.

The standard of review for such a determination is abuse of discretion. (See *Board of Education* v. *Haas* (1978) 82 Cal.App.3d 278, 282 [147 Cal.Rptr. 88]; *Board of Trustees* v. *Porini* (1968) 263 Cal.App.2d 784, 794-795 [70 Cal.Rptr. 73].)

On this record, no abuse appears. At trial, defendant did not introduce any evidence in support of his position that the information provided to Dr. Yago by Allison was not reasonably reliable for a psychiatrist forming a psychiatric opinion. He did indeed present vigorous argument. His words, however, were lacking in persuasive force: they did little more than beg the question. On appeal, defendant presents argument more vigorous still. But again, his words are lacking: he simply does not show that the challenged information was not reasonably reliable *for a psychiatrist forming a psychiatric opinion.* Certainly, such information is not unreliable per se. (See *People* v. *Coleman* (1985) 38 Cal.3d 69, 87-93 [211 Cal.Rptr. 102, 695 P.2d 189] (plur. opn.).)

We agree with defendant that a psychiatrist forming a psychiatric opinion could not have reasonably relied on the information provided to Dr. Yago by Allison unless he subjected it to critical scrutiny. Dr. Yago did so. But we simply do not agree that such an expert forming such an opinion could not have reasonably relied on such information at all. Indeed, we observe in passing that, as a general matter, the challenged information was not internally inconsistent or in conflict with evidence introduced at trial by the People and defendant. In any event, it is apparent from Dr. Yago's testimony that her opinion was not based in any significant part on the information in question.

Defendant argues against our conclusion that the trial court's denial of his motion was not error.

To the extent that he invokes sections of the Evidence Code dealing with expert opinion testimony, we reject the point on the merits for the reasons stated above. He faults the trial court's statements attending its ruling in certain particulars. Any deficiency is basically verbal and therefore of no consequence here. What matters is whether the ruling itself is sound. It is.

Indeed, any other ruling would have been improper on this record. Contrary to what appears to be defendant's implication at one point, the plurality opinion in *People* v. *Coleman, supra,* 38 Cal.3d 69, 90-92, does not stand for the proposition that on direct examination an expert may *never* testify to extrajudicial statements when he gives "the reasons for his opinion and the matter . . . upon which it is based" (Evid. Code, § 802).

To the extent defendant invokes other provisions of law, including Evidence Code section 352, we reject the point on procedural grounds. As stated above, the rule is that a defendant may not complain on appeal that evidence was inadmissible on a certain ground if he did not rely on that ground in a timely and specific fashion in the trial court. ▆▆▆ At trial, defendant did not effectively rely on a basis other than Evidence Code section 801 et seq.[16] He now maintains that the foregoing rule is inapplicable here, but he is not persuasive.[17]

---

[16]In moving to bar Dr. Yago from testifying, defendant asserted through counsel that any opinion she might have formed was inadmissible as violative of "our constitutional right to confrontation . . . ." He now urges that these words amounted to timely and specific reliance on the confrontation clause of the Sixth Amendment to the United States Constitution as applied to the states through the due process clause of the Fourteenth Amendment. Having reviewed the pertinent record, we cannot agree. But if we were inclined to proceed beyond the threshold, we would reject the point on the merits. Defendant's assertion was predicated on a claim that the information provided to Dr. Yago by Allison was hearsay. Of course, it was not. For purposes of the confrontation clause (e.g., *Tennessee* v. *Street* (1985) 471 U.S. 409, 413-414 [85 L.Ed.2d 425, 430-431, 105 S.Ct. 2078])—as well as the Evidence Code (Evid. Code, § 1200)—a statement is hearsay if it was made out of court *and* if it is subsequently introduced in court for its truth. Here, the People did not seek to introduce the challenged information for its truth, and did not actually do so. The trial court's instruction, quoted above, was an "appropriate way to limit the jury's use of that evidence in a manner consistent with the Confrontation Clause." (*Tennessee* v. *Street, supra,* at p. 417 [85 L.Ed.2d at p. 433].)

[17]Defendant claims that the trial court erred by allowing introduction of the information provided to Dr. Yago by Allison for any purpose whatever. But as noted, a defendant may not complain here that evidence was inadmissible on a certain ground if he did not rely on that ground in a timely and specific fashion below. A fortiori, he may not attack the admission of evidence now if he made no attack before. At trial, defendant effectively opposed the introduction of Dr. Yago's testimony—but not the introduction of the information provided to her by Allison: his motion outside the jury's presence sought to bar Dr. Yago from testifying; his objection in its presence expressly "[r]enew[ed]" that motion. Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. (E.g., *People* v. *Bonin* (1988) 46 Cal.3d 659, 699 [250 Cal.Rptr. 687, 758 P.2d 1217].) We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions. (*Francis* v. *Franklin, supra,* 471 U.S. at p. 325, fn. 9 [85 L.Ed.2d at p. 360].) Defendant's assertion to the contrary notwithstanding, that presumption stands unrebutted here. We recognize that in summation the prosecutor referred to the information provided to Dr. Yago by Allison as though it had been introduced for its truth. But that reference—which was brief and isolated—does not undermine our conclusion.

E. *Instructional Errors Relating to the Determination of Penalty*

Defendant contends that the trial court committed various errors by instructing the jury as it did on the determination of penalty. We shall consider the claims seriatim.

1. *Instructions on the Determination of Penalty*

The trial court instructed the jury in accordance with CALJIC No. 8.84.1 (4th ed. 1979) as modified and, ultimately, in accordance with section 190.3, as follows.

"In determining which penalty is to be imposed on Douglas Mickey, you shall consider all the evidence which has been received during any part of the trial of this case . . . . You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crime of which Douglas Mickey was convicted in the present proceeding and the existence of any special circumstance(s) found to be true.

"(b) The presence or absence of criminal activity by Douglas Mickey which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while Douglas Mickey was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in Douglas Mickey's homicidal conduct.

"(f) Whether or not the offense was committed under circumstances which Douglas Mickey reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not Douglas Mickey acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of Douglas Mickey to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or the effects of intoxication.

"(i) The age of Douglas Mickey at the time of the crime.

"(j) Whether or not Douglas Mickey was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

At defendant's request, the trial court gave the following instruction.

"You may consider pity, sympathy or mercy in deciding the appropriate punishment; however, you should not be governed by mere conjecture, prejudice or public opinion.

"Factors in mitigation may include, but are not limited to, Douglas Scott Mic[k]ey's character, background, history, mental condition and physical condition."

The trial court instructed in conformity with CALJIC No. 8.84.2 (4th ed. 1979) and, ultimately, in conformity with section 190.3. The following part (which was delivered twice in the course of the charge) is pertinent here.

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed upon defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

### 2. Claim of Error Concerning Failure to Instruct on "Overlapping" Special Circumstances

▮▮ Defendant claims, in substance, that the trial court erred by failing to instruct the jury that the felony-murder-burglary and felony-murder-robbery special circumstances found as to each of the two murders arose from what he alleges was "a single act or an indivisible course of conduct

with one principal criminal objective" (*People* v. *Harris* (1984) 36 Cal.3d 36, 66 [201 Cal. Rptr 782, 679 P.2d 433] (plur. opn.)) and, as a result, could be considered only as a single circumstance for the purposes of determining penalty. His point is predicated on an assertion that "unitary" consideration of "overlapping" special circumstances is required by the prohibition against multiple punishment of Penal Code section 654 and also by the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution.

The claim is without merit. Its premise is unsound. To be sure, the *Harris* plurality supported defendant's assertion. (36 Cal.3d at pp. 62-67.) But in *People* v. *Melton* (1988) 44 Cal.3d 713, 765-768 [244 Cal.Rptr. 867, 750 P.2d 741], a majority of this court subsequently held to the contrary. Accordingly, the point fails. (Compare *ibid.* [rejecting a similar claim].)

3. *Claim of Skipper Error*

 Defendant claims in substance that by instructing the jury as it did, the trial court committed so-called "*Skipper* error." (*Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].)

". . . [I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment, [citation], requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

"This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304-305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (lead opn. of Stewart, Powell and Stevens, JJ.).)

 To guarantee that capital sentencing decisions are as individualized and reliable as the Constitution demands, the Eighth Amendment requires that the defendant may not be barred from introducing any relevant mitigating evidence. (*Skipper* v. *South Carolina, supra,* 476 U.S. at pp. 4-8 [90 L.Ed.2d at pp. 6-9]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 112-116 [71 L.Ed.2d 1, 9-12, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 597-605 [57 L.Ed.2d 973, 985-990, 98 S.Ct. 2954] (plur. opn. by Burger,

C. J.); *Bell* v. *Ohio* (1978) 438 U.S. 637, 642 [57 L.Ed.2d 1010, 1016, 98 S.Ct. 2977] (plur. opn. by Burger, C. J.).)

It follows that the Eighth Amendment also requires that a jury and its individual members (*McKoy* v. *North Carolina* (1990) 494 U.S. 433, 438-443 [108 L.Ed.2d 369, 378-381, 110 S.Ct. 1227, 1231-1234]) "may not . . . be precluded from considering 'any relevant mitigating evidence[ ]' " (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 4 [90 L.Ed.2d at p. 6], quoting *Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 114 [71 L.Ed.2d at p. 11]; accord, *McKoy* v. *North Carolina, supra,* 494 U.S. at pp. 438-443 [108 L.Ed.2d at pp. 378-381, 110 S.Ct. at pp. 1231-1234]; *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 394, 398-399 [95 L.Ed.2d 347, 350, 352-353, 107 S.Ct. 1821]; *Mills* v. *Maryland* (1988) 486 U.S. 367, 374-375 [100 L.Ed.2d 384, 393-394, 108 S.Ct. 1860]).

Therefore, when any barrier, whether statutory, instructional, evidentiary, or otherwise (see *Mills* v. *Maryland, supra,* 486 U.S. at pp. 374-375 [100 L.Ed.2d at pp. 393-394]), precludes a jury or any of its members (*McKoy* v. *North Carolina, supra,* 494 U.S. at pp. 438-443 [108 L.Ed. at pp. 378-381, 110 S.Ct. at pp. 1231-1234]) from considering relevant mitigating evidence, there occurs federal constitutional error, which is commonly referred to as "*Skipper* error." (See generally *Skipper* v. *South Carolina, supra,* 476 U.S. at pp. 4-8; *Hitchcock* v. *Dugger, supra,* 481 U.S. at pp. 394, 398-399; *Mills* v. *Maryland, supra,* 486 U.S. at pp. 374-375; *McKoy* v. *North Carolina, supra,* 494 U.S. at pp. 438-443 [108 L.Ed.2d at pp. 378-381, 110 S.Ct. at pp. 1231-1234].)

When the claimed barrier to the jury's consideration of relevant mitigating evidence is an instruction, the crucial question for determining error "is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of" such evidence. (*Boyde* v. *California, supra,* 494 U.S. 370, 380 [108 L.Ed.2d 316, 329, 110 S.Ct. 1190, 1198].)

 After close consideration, we reject defendant's claim of error. The challenged instructions told the jury that "you shall consider, take into account and be guided by the applicable factors of . . . mitigating circumstances," which "may include, but are not limited to, Douglas Scott Mic[k]ey's character, background, history, mental condition and physical condition." They also declared that "You may consider pity, sympathy or mercy in deciding the appropriate punishment . . . ." Further, in their summations both the prosecutor and defense counsel delivered the same message.

Defendant argues that the challenged instructions "had two flaws: first, they did not require the sentencer to consider the mitigating evidence but simply permitted it to do so, and, second, they placed the mitigating factors of character, background, history, etc., on a different plane than [*sic*] the factors enumerated in CALJIC No. 8.84.1, [factors] (a) through (k)." The instructions themselves, which are quoted above, refute the assertion.

In view of the foregoing, there is not a reasonable likelihood that the jurors applied the challenged instructions in a way as to prevent themselves from considering any or all of the potentially mitigating evidence adduced at trial.

 Under the foregoing analysis, we also reject defendant's claim that the trial court committed *Skipper* error by failing to delete the italicized word from each of the following penalty factors: "Whether or not the offense was committed while Douglas Mickey was under the influence of *extreme* mental or emotional disturbance" (italics added); and, "Whether or not the offense was committed under circumstances which Douglas Mickey *reasonably* believed to be a moral justification or extenuation for his conduct" (italics added).

Defendant argues in substance that the challenged instructions amounted to an incorrect statement of the law: (1) under the Eighth Amendment to the United States Constitution, the jury may not be precluded from considering any relevant mitigating evidence; (2) such evidence was presented in the form of "extreme mental or emotional disturbance" and "reasonable belief in moral justification or extenuation"—and also in the form of "non-extreme disturbance" and "unreasonable belief"; and (3) contrary to the constitutional principle stated above, the instructions implied that the jurors could consider only the former and not the latter.

To be sure, the major premise of defendant's argument is sound. But a crucial minor premise is not. First, the challenged instructions simply did not carry the preclusive implication he asserts they did: they did indeed state that the jury could consider "extreme mental or emotional disturbance" and "reasonable belief in moral justification or extenuation"—but not *only* "*extreme* mental or emotional disturbance" and "*reasonable* belief in moral justification or extenuation." Second, one of the instructions given on defendant's request was expressly inclusive: "Factors in mitigation may include, but are not limited to, Douglas Scott Mic[k]ey's character, background, history, *mental condition* and physical condition." (Italics added.) On the record set out above, there is not a reasonable likelihood that the jury would have inferred that they could not consider disturbance or belief *of any kind or degree whatever* in mitigation of penalty.

■ We also reject defendant's claim that the trial court erred by refusing to give, on his request, Defense Instruction No. 23: "A mitigating circumstance does not have to be proved beyond a reasonable doubt to exist. You must find that a mitigating circumstance exists if there is any substantial evidence to support it."

A court may—and, indeed, must—refuse an instruction that is an incorrect statement of the law. (See *People* v. *Gordon, supra*, 50 Cal.3d at p. 1275.) A court may also refuse an instruction that is duplicative. (See *People* v. *Benson, supra*, 52 Cal.3d at p. 805, fn. 12.) The second sentence of Defense Instruction No. 23 is incorrect. The law simply does not so constrain the discretion of the jury or its individual members. The first sentence is duplicative. Implicit in the penalty charge as a whole was the statement expressed therein.

### 4. *Claim of Error Concerning "Sympathy" Instruction*

■ Defendant claims that the trial court erred by instructing the jury on "sympathy" in accordance with his own request: "You may consider pity, sympathy or mercy in deciding the appropriate punishment; however, you should not be governed by mere conjecture, prejudice or public opinion." He argues that the instruction allowed the jurors to take into account any sympathy they might have had for Hanson and/or Blount, and that in this respect it was violative of the cruel and unusual punishments and due process clauses of the Eighth and Fourteenth Amendments to the United States Constitution and the analogous provisions of article I, sections 17 and 7 and 15, of the California Constitution.

We find no error. Defendant's primary, and factual, premise is unsupported. The instruction does not carry the meaning he asserts. A reasonable juror would have understood the language in question to allow consideration of sympathy *for defendant*. That meaning is practically declared by the words themselves. It is also confirmed by their context: immediately following is the instruction, "Factors in mitigation may include, but are not limited to, Douglas Scott Mic[k]ey's character, background, history, mental condition and physical condition." In addition, that meaning was anticipated by the prosecutor and defense counsel in their summations: they agreed that the jurors could consider sympathy for defendant—but did not even suggest that they could consider sympathy for the victims. In our view, a reasonable juror could not have understood the challenged instruction as defendant claims.[18]

---

[18]Defendant appears to imply that the trial court should have given, on his request, Defense Instruction No. 1, which states as relevant here: "[I]n this part of the trial the law does not forbid you from being influenced by pity for Douglas Mickey and you may be governed by

### 5. *Claim of Error Relating to Certain Refused Instructions*

Defendant claims that the trial court erred by refusing to give the following instructions on his request.

Defense Instruction No. 3: "The mitigating circumstances that I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence in this case. You should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But you should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances relating to the case or to DOUGLAS SCOTT MICKEY as shown by the evidence as reasons for not imposing the death sentence."

Defense Instruction No. 4: "Another factor for your consideration in determining the appropriate penalty is the concept of fairness. Not only must we strive to accomplish equal justice, but, just as importantly, it should clearly appear to all observers as though justice is being accomplished. In this case, Edward Rogers, who is equally culpable as a principal in these crimes, was granted complete immunity from the charges of murder in this case and was further granted immunity from perjury with respect to statements made by him under oath and will not serve any prison sentence whatever. Measured against this, you are given a choice of only two sentencing alternatives—life imprisonment without the possibility of parole or death. You may consider the disparity of treatment between Edward Rogers and Douglas Mickey in selecting the sentence to be imposed." (Paragraphing omitted.)

Defense Instruction No. 8: "You may consider DOUGLAS SCOTT MICKEY'S potential for contributing affirmatively to the lives of his family and friends as a mitigating circumstance."

Defense Instruction No. 12: "Mitigating factors were not introduced to justify or excuse the offense in question. They may, however, be considered as an extenuating circumstance in determining the appropriate punishment."

Defense Instruction No. 15: "You may consider Douglas Scott Mickey's potential for rehabilitation and for contributing affirmatively to the lives of

mere sentiment and sympathy for Douglas Mickey in arriving at a proper penalty in this case; however, the law does forbid you from being governed by mere conjecture, prejudice, public opinion or public feeling." Defendant fails to acknowledge that he himself withdrew his request.

those around him within the prison as a mitigating circumstances [*sic*]; you may also consider the fact that he has presented no custodial problem and is unlikely to do so in the future as a mitigating circumstances [*sic*]."

Defense Instruction No. 21: "I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. These are the only aggravating circumstances that you may consider. You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case."

 After review, we find no error in the trial court's refusal of the requested instructions quoted above.

 As we have declared, a court may, and must, refuse an instruction that is an incorrect statement of the law. The same is true of "an instruction that is argumentative, i.e., of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1276; accord, *People* v. *Benson, supra,* 52 Cal.3d at p. 805.) As we have also declared, a court may refuse an instruction that is duplicative.

 Defense Instruction No. 21 is incorrect. "To be sure, the law permits the jury to consider only penalty factors (a) through (j) of section 190.3, and evidence relevant thereto, in determining aggravation. [Citation.] But the factors set out in the list the court delivered omitted [the victim-consent portion of statutory factor (e)]. Therefore, the requested instruction was incorrect in [implying] that the court's list set out the only factors the law permitted the jury to consider." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1275.)

Defense Instructions Nos. 4, 8, 12, and 15 are plainly argumentative. No further comment is required.

Defense Instruction No. 3 is in part argumentative—to the extent it states that a single mitigating circumstance can carry potentially dispositive weight, but does not say the same as to a single aggravating circumstance. And it is in part duplicative—to the extent it overlaps the instruction that "Factors in mitigation may include, but are not limited to, Douglas Scott Mic[k]ey's character, background, history, mental condition and physical condition."

 Defendant claims that the trial court did indeed err by refusing the requested instructions. He argues he was entitled to the instructions under

*People* v. *Sears* (1970) 2 Cal.3d 180, 189-190 [84 Cal.Rptr. 711, 465 P.2d 847]. He is wrong. Under *Sears*, a criminal defendant has a right to an instruction that pinpoints the *theory* of the defense. (*People* v. *Benson, supra,* 52 Cal.3d at p. 806; *People* v. *Gordon, supra,* 50 Cal.3d at p. 1276.) The instructions here did not do so.

Defendant also argues he was entitled to the requested instructions under the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution as construed in *Lockett* v. *Ohio, supra,* 438 U.S. 586, and its progeny. Again he is wrong. Under those cases, a criminal defendant has a right to clear instructions that guide and focus the jury's consideration of the offense and the offender. (*People* v. *Benson, supra,* 52 Cal.3d at p. 806; *People* v. *Gordon, supra,* 50 Cal.3d at p. 1277.) Defendant received such instructions. But under those cases, a criminal defendant does not have a right to an instruction—like those here—that invites the jury to draw favorable inferences from the evidence. (*People* v. *Benson, supra,* at p. 806; *People* v. *Gordon, supra,* at p. 1277.)

Finally, defendant argues he was entitled to the requested instructions under the due process clauses of article I, sections 7 and 15, of the California Constitution and also, apparently, under the analogous provision of the Fourteenth Amendment to the United States Constitution. His premise is that the instructions were necessary to assure that the penalty phase was fundamentally fair in procedure and basically reliable in result. No such necessity appears.

### 6. *Claim of Brown Error*

Defendant claims that the trial court committed so-called *Brown* error by instructing the jury as it did on the process by which penalty is to be determined. (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

The final paragraph of section 190.3 declares in relevant part: "the trier of fact . . . *shall* impose a sentence of death if" it "concludes that the aggravating circumstances outweigh the mitigating circumstances." (Italics added.)

In *Brown*, we construed the statutory provision as follows. "In this context, the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of

'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . . By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (40 Cal.3d at p. 541, fn. omitted.)

Stated simply, the statutory provision "requires jurors to make a moral assessment on the basis of the character of the individual defendant and the circumstances of the crime and thereby decide which penalty is appropriate in the particular case." (*People* v. *Bonin, supra,* 47 Cal.3d at p. 856.)

Although in *Brown* we construed the statutory provision thus, we nevertheless recognized that when delivered in an instruction its mandatory-penalty-determination language might mislead jurors as to the scope of their sentencing discretion. (40 Cal.3d at p. 544, fn. 17.) Specifically, a juror might reasonably understand that language to define the penalty determination as "simply a finding of facts" (*id.* at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale[ ]' " (*id.* at p. 541). In other words, he might be misled as to the nature of the process by which penalty is to be determined. A juror might also reasonably understand the language to require him to vote for death if he finds that aggravation outweighs mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544.) That is to say, he might be misled as to the character of the ultimate question to be resolved in the process of determining penalty.

To mislead jurors as to the scope of their sentencing discretion, as *Brown* itself makes plain, is error under state law. (See 40 Cal.3d at pp. 540-544.) But as a general matter at least, it is not error of federal constitutional dimension: it does not implicate the cruel and unusual punishments clause of the Eighth Amendment or apparently any other provision of the federal charter. (See *People* v. *Sanders* (1990) 51 Cal.3d 471, 534, fn. 2, 535, fn. 3 [273 Cal.Rptr. 537, 797 P.2d 561] (dis. opn. of Mosk, J.).)

In deciding whether the jurors in any given case were in fact misled, "we examine the whole record and in particular the arguments of counsel" (*People* v. *Lang* (1989) 49 Cal.3d 991, 1034 [264 Cal.Rptr. 386, 782 P.2d 627]; see *People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17) as they would or could have been understood by the hypothetical "reasonable juror"

(*People* v. *Sanders, supra,* 51 Cal.3d at p. 535 & fn. 3 (dis. opn. of Mosk, J.); see *People* v. *Brown, supra,* at pp. 540-544).

 After review, we are of the opinion that the jurors in this case were not misled as to the scope of their sentencing discretion.

At the outset, we recognize that the trial court's instruction—which it gave at two points in its charge—followed the potentially misleading language of the final paragraph of section 190.3. We also recognize that the prosecutor paraphrased that language in his summation—and had previously paraphrased it during voir dire of prospective jurors.

Be that as it may, both the prosecutor and defense counsel made it clear in their summations that the jurors were required to make a moral assessment of defendant and his crimes and thereby decide which penalty was appropriate. Indeed, both delivered a message on that point that was all but express.

Moreover, neither the prosecutor nor defense counsel suggested to the jurors that the penalty determination was "simply a finding of facts" (*People* v. *Brown, supra,* 40 Cal.3d at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale[ ]' " (*id.* at p. 541), or that it was somehow "compelled" by the "law" regardless of their individual views on the appropriateness of death. Quite the opposite—as the statements quoted above reveal beyond peradventure.

Accordingly, on this record we cannot find *Brown* error. The jurors here were not misled as to the scope of their sentencing discretion. Having heard the summations by the prosecutor and defense counsel, a reasonable juror would have come to a proper understanding of both the nature of the process by which penalty was to be determined and the ultimate question to be resolved in that process. Such a juror could not have formed any other view.[19]

 In a related point, defendant claims that the trial court erred by refusing to give, on his request, Defense Instruction No. 19: "You are instructed that a life without parole verdict means exactly what it says: that the defendant shall be imprisoned for the rest of his life. And you are

___

[19]In passing, defendant claims that "the instruction violated the federal Constitution by leading the jury to believe that the law compelled a death verdict and therefore responsibility for the verdict lay elsewhere [citation] and by unconstitutionally curtailing the jurors' discretion to return a punishment less than death if they believed the same to be appropriate under all the relevant evidence placed before them." The assertion is refuted by the analysis set out above.

instructed that a death verdict means exactly what it says: that the defendant will be executed. For you to conclude otherwise, would be to rely upon speculation or conjecture and would be a violation of your oath as a juror."

We find no error. As stated above, a court may, and must, refuse an instruction that is incorrect. Defense Instruction No. 19 is such: "It is . . . incorrect to tell the jury the penalty of death or life without possibility of parole will inexorably be carried out" (*People* v. *Thompson* (1988) 45 Cal.3d 86, 130 [246 Cal.Rptr. 245, 753 P.2d 37]). Defendant argues the court should have given the instruction because: (1) at least one of the jurors had assertedly expressed a belief during voir dire that life imprisonment without possibility of parole might not mean what it said; and (2) the meaning of life imprisonment without possibility of parole was assertedly of critical significance in this case. The fact remains, however, that the instruction is incorrect. Hence, it was properly refused. (See *People* v. *Thompson, supra,* at p. 131.)

### 7. *Claim of Error as to the Burden of Proof*

■ Defendant claims that the trial court erred by refusing to give, on his request, Defense Instruction No. 17, which states in relevant part: "You may impose a penalty of death only where the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt and only where you are convinced beyond a reasonable doubt that the death penalty is the appropriate punishment."

Defendant's position is that Defense Instruction No. 17 correctly states the law. In support, he may be understood to argue that imposition on the People of the burden of proof beyond a reasonable doubt as to each of the following issues is required by the 1978 death penalty law: (1) a circumstance in aggravation may be considered only if its existence is proved beyond a reasonable doubt; (2) the penalty may be fixed at death only if the aggravating circumstances are found to outweigh the mitigating beyond a reasonable doubt; and (3) the penalty may be fixed at death only if death is determined to be the appropriate punishment beyond a reasonable doubt. That is not the case. (*People* v. *Benson, supra,* 52 Cal.3d at p. 808.) He then argues that imposition of the burden is required by the Constitutions of the United States and California, specifically: (1) the cruel and unusual punishments clauses of the Eighth Amendment and article I, section 17; (2) the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15; and, apparently, (3) the equal protection clauses of the Fourteenth Amendment and

article I, section 7. That, also, is not the case. (E.g., *People* v. *Benson, supra,* at p. 808; *People* v. *Marshall, supra,* 50 Cal.3d at pp. 935-936.)[20]

### F. Miscellaneous Instructional Errors

■ Defendant contends that the trial court erred by instructing the jury in accordance with CALJIC No. 2.11 (4th ed. 1979) as follows: "Neither side is required to call as witnesses all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events, or to produce all objects or documents mentioned or suggested by the evidence."

In support, defendant asserts that "The vice of this instruction at the penalty phase of a capital trial is its implication that there was evidence in aggravation not placed before the jury. In essence, it invites the jury to speculate on the probable existence of non-statutory aggravating factors, in violation of the rule of *People* v. *Boyd* [(1985)] 38 Cal.3d 762, 772-76."

The assertion is empty. Plainly, the challenged instruction does not give such an "invitation" to a reasonable juror as a general matter. Nor did it do so under the unique facts of this particular case.

■ Defendant contends that the trial court erred by failing to instruct the jury on another point. At the guilt phase, the People called Edward Rogers and presented his testimony against defendant. In its charge, the court declared—properly—in conformity with CALJIC No. 3.18 (4th ed. 1979 (1979 rev.)) that "The testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case." The court also declared—again properly—that Edward Rogers was an accomplice as a matter of law. At the penalty phase, the People did not call Rogers but they did rely on the testimony he had previously given, with the prosecutor extensively quoting his words in summation. In its charge, the court instructed the jurors to "consider all the evidence which has been received during any part of the trial of this case . . . ." It did not repeat the instructions referred to above.

---

[20]We note that the trial court gave the following instruction: "Before you may consider a particular aggravating circumstance to be true, you must be satisfied of the existence of that aggravating circumstance beyond a reasonable doubt." Rightly so. The only potential circumstances in aggravation comprised crimes, present adjudicated or prior unadjudicated. The reasonable doubt standard, of course, applies both to the former (see, e.g., Pen. Code, § 1096) and to the latter (see, e.g., *People* v. *Benson, supra,* 52 Cal.3d at p. 809).

Defendant claims that the trial court erred by failing to reinstruct that an accomplice's testimony should be viewed with distrust. We disagree. Of course, when the People present the testimony of an accomplice, the court must instruct, sua sponte, that such testimony should be viewed with distrust. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1314 [248 Cal.Rptr. 834, 756 P.2d 221].) But the same obligation does not arise when, as here, they merely rely on previously given testimony covered by previously delivered instructions.

### G. *Consideration of Invalid Special Circumstances*

Defendant contends that the trial court erred by allowing the jury to consider the invalid special-circumstance findings as to multiple murder and intentional murder for financial gain. (See pts. III.A. & III.B., *ante*.)

Error did indeed occur. But reversal is not required. "Certainly, the error here is not prejudicial per se, but rather is subject to harmless-error analysis. Whether it violates state law only or implicates the United States Constitution as well is immaterial. It is harmless under both the 'reasonable possibility' test of *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135], and the 'reasonable doubt' test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. 'Although we presume that the jurors [followed their instructions and] considered the invalid special-circumstance findings independent of their underlying facts, we cannot conclude that they could reasonably have given them any significant independent weight.' " (*People* v. *Benson, supra,* 52 Cal.3d at p. 793.) Indeed, in his summation the prosecutor himself strongly argued that the findings carried no force apart from the facts. Any reasonable juror would have been persuaded.

### H. *Denial of Verdict-modification Application*

Defendant made an application for modification of the verdict of death under Penal Code section 190.4, subdivision (e) (hereafter section 190.4(e)). The trial court denied the request. Defendant contends that the court erred by so doing.

"In ruling on a verdict-modification application, the trial judge is required by section 190.4(e) to 'make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.' [Citations.] That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. [Citation.] And he must make that determination independently, i.e., in accordance with the weight he himself

believes the evidence deserves." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 942.)

■ On appeal, we subject a ruling on such an application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo (see generally *People* v. *Louis, supra,* 42 Cal.3d at pp. 984-988). Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty.

■ Defendant claims that contrary to the requirements of section 190.4(e), the trial judge failed to make an *independent* determination as to whether the jury's verdict of death was adequately supported. We disagree.

Near the beginning of his statement of reasons, the trial judge acknowledged section 190.4(e)'s requirement of independent determination: "In ruling on this application for automatic motion to modify, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3 of the Penal Code, and shall make an *independent* determination as to whether the weight of the evidence supports the jury's findings and verdicts." (Italics added.)

The trial judge then made the following observation: "A question to be asked and answered is whether the statute intends to permit the trial judge to reverse the jury's verdict of death upon the judge's own assessment of the evidence, guided by the evidence of aggravation and mitigation, or only to modify if the jury's findings are not supported by the weight of the evidence."

The trial judge did not clearly answer the question—although he appears to have adopted the former interpretation. He did, however, make plain that under either construction the verdict would stand.

In so doing, the trial judge discharged his obligation under section 190.4(e): he effectively determined that the verdict of death was adequately supported in accordance with the weight he himself believed the evidence deserved.

Defendant argues against our conclusion. His premise is that the trial judge is required by section 190.4(e) to make a penalty determination of his own, independent of the jury's verdict. Not so. ■ "[T]he trial judge's function is not to make an independent and de novo penalty determination,

but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict.*" (*People* v. *Lang, supra,* 49 Cal.3d at p. 1045, italics in original.) The trial judge carried out his function here.

 Next, defendant claims that the trial judge refused (or at least, may have refused) to consider certain potentially mitigating evidence defined by the Eighth Amendment—specifically, that relating to background and character. He asserts that the judge erroneously believed (or at least, may have believed) that only such evidence as may extenuate the gravity of the capital crime can be mitigating, and that as a result he declined (or at least, may have declined) to take account of other potentially mitigating evidence. Again we disagree.

As he all but expressly declared in his statement of reasons, the trial judge considered all the potentially mitigating evidence, "nonextenuating" as well as "extenuating." We simply cannot conclude that he labored under any misconception about the scope of what he could take into account. In his charge at the penalty phase, he told the jurors that "you shall consider, take into account and be guided by the applicable factors of . . . mitigating circumstances," which "may include, but are not limited to, Douglas Scott Mic[k]ey's character, background, history, mental condition and physical condition." He also told them that "You may consider pity, sympathy or mercy in deciding the appropriate punishment . . . ." With these instructions, he directed the jurors to consider all the potentially mitigating evidence, "nonextenuating" as well as "extenuating," in deciding on their verdict. It is inconceivable that he believed he could not take such evidence into account in reviewing their decision.

"Although the trial court did not expressly *mention* the mitigating evidence referred to by defendant, there is no indication in the record that the court ignored or overlooked such evidence." (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 625 [244 Cal.Rptr. 200, 749 P.2d 854], italics in original.)

We recognize that the trial judge stated that he "has reexamined the material offered in the penalty phase by the defense, and personally finds beyond any reasonable doubt that there were no circumstances which extenuated the gravity of the crimes, whether or not it be a legal excuse." Contrary to defendant's assertion, these words do not manifest a belief on the judge's part that only "extenuating" evidence can be mitigating. Rather, they merely reveal a determination by the judge—which in our view is altogether sound—that the potentially mitigating evidence was not in fact extenuating.

Here too defendant argues against our conclusion. At bottom, he does nothing more than complain about the trial judge's independent weighing of the evidence. His complaint, however, is without substance and must therefore be dismissed.[21]

I. *"Cumulative Prejudice"*

 ██ ██ Defendant contends that the effect of the errors we have found, when considered together, is prejudicial. We disagree.[22]

## V. DISPOSITION

For the reasons stated above, we set aside one of the multiple-murder special-circumstance findings and both of the intentional-murder-for-financial-gain special-circumstance findings. We affirm the judgment in all other respects.

It is so ordered.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied January 8, 1992.

---

[21]In supplemental briefing before oral argument, defendant makes a perfunctory attempt to clothe various of his contentions in federal and state constitutional garb. He fails.

[22]Having reviewed the record in its entirety, we conclude that the jury found that defendant actually killed, *and* intended to kill, Eric Lee Hanson and Catherine Blount within the meaning of *Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]. We also conclude that these findings are amply supported and adopt them as our own. Accordingly, we hold that imposition of the penalty of death on defendant does not violate the Eighth Amendment to the United States Constitution. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716, 106 S.Ct. 689].)